OPINION
RENDELL, Circuit Judge:
One of the many provisions of the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010), requires employer-provided health insurance plans to cover an array of preventative services, including FDA-approved contraceptives, at no cost to participating employees. Employees have the option of seeking out covered medical providers and using their services, in which case they are reimbursed, or they can choose not to use them. The particular provision that includes contraceptive coverage is commonly referred to as the “Contraceptive Mandate,” and it includes a limited exemption for houses of worship and their integrated auxiliaries. See 45 C.F.R. § 147.131(a); 77 Fed. Reg. 8,725, 8,726 (Feb. 15, 2012). A wider set of religious non-profit and for-profit employers may receive an accommodation whereby they opt out of providing contraceptive coverage, with the Government then arranging for their employees to receive the coverage through third parties at no cost to, and with no participation of, the objecting employers. See 45 C.F.R. § 147.131(b)—(c); 78 Fed. Reg. 39,870, 39,-874-39,875 (July 2, 2013); Zubik v. Burwell, — U.S. -, 136 S.Ct. 1557, 1559, 194 L.Ed.2d 696 (2016).
Two years after we upheld this opt-out accommodation in Geneva College v. Secre *343 tary United States Department of Health and Human Services, 778 F.3d 422, 427 (3d Cir. 2015), vacated and remanded sub nom. Zubik, 136 S.Ct. at 1561, we now confront the house-of-worship exemption. This appeal presents two primary questions that again derive from the purported intersection of the Contraceptive Mandate and religion: (1) whether the Contraceptive Mandate must exempt a secular anti-abortion group with no religious affiliation, and (2) whether an employee’s religious beliefs are substantially burdened by the law’s requirement that his or her employer’s insurance plan cover contraceptives. After careful review, but without any hesitation, we answer both questions in the negative.
Appellant Real Alternatives urges that, pursuant to the Equal Protection Clause of the Fifth Amendment, if a religious organization may be exempted from the Contraceptive Mandate, then non-religious entities with an identical stance on contraceptives must be exempted as well. Real Alternatives additionally challenges the Contraceptive Mandate and the criteria for the exemption as not only arbitrary and capricious under the Administrative Procedures Act but also contrary to federal law.
The other appellants, three employees of Real Alternatives, bring individual challenges to the Contraceptive Mandate. They argue that the Contraceptive Mandate violates the Church Amendment, 42 U.S.C. § 300a-7(d). They also argue that maintaining a health insurance plan that covers contraceptives through their employer violates their religious rights under the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb to 2000bb-4 (“RFRA”).
The District Court denied Appellants’ motion for summary judgment in its entirety and granted the Government’s cross-motion for summary judgment in its entirety. Because we agree with the District Court’s rulings on all of the issues raised, we will affirm.
I. BACKGROUND
A. Statutory and Regulatory Framework
1. The Affordable Care Act and the Contraceptive Mandate
In 2010, Congress passed the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010), and the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (2010) (collectively, the “ACA”). The ACA requires non-grandfathered group health plans and insurance providers to cover four categories of preventative health services; without cost-sharing, as provided for in guidelines supported by the Health Resources and Services Administration (“HRSA”), an arm of the Department of Health and Human Services (“HHS”).[1] One of these four categories is “preventative care and screenings” for women.
HHS requested assistance from the Institute of Medicine (“IOM”), a non-profit division of the National Academy of Sciences, to develop guidelines on the specific preventative services for women to be covered under the ACA (none existed at the time the ACA was passed). The IOM recommended that HRSA endorse a list of services that included “[FDA]-approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity.” Institute of Medicine, Clinical *344 Preventative Services for Women: Closing the Gaps 10 (2011). Examples of FDA-approved contraceptive methods are diaphragms, oral contraceptives, intrauterine devices, and emergency contraceptives. Id. at 105-06. HRSA adopted the IOM’s guidelines in full. Health Resources & Service Administration, Women’s Preventative Service Guidelines, available at https://www.hrsa.gov/womensguidelines/ (last visited Jan. ,27, 2017). In doing so, HRSA required every group health plan and health insurance plan to include coverage for these preventative care services to employees working at non-exempt employers (the “Contraceptive Mandate”). It did not require anything from the employee.
2. Exemption to the Contraceptive Mandate
At the same time as HRSA adopted IOM’s recommended guidelines, an exemption from the Contraceptive Mandate for certain religious employers was proposed as an interim Anal regulation (the “Exemption”), 76 Fed. Reg. 46,621 (Aug. 3, 2011). Commenters to the proposed guidelines had suggested that requiring religious employers to sponsor group health plans that provide contraceptive services could impinge on those employers’ religious freedom. Id. at 46,623. In light of those comments, HHS and the Departments of Labor and Treasury (collectively, the “Departments”), the agencies named in Real Alternatives’s underlying lawsuit, authorized HRSA to exempt certain religious employers from the Contraceptive Mandate. The Departments specified that they sought “to provide for a religious accommodation that respects the- unique relationship between a house of worship and its employees in ministerial positions” and that “[s]uch an accommodation would be consistent with the policies of States that require contraceptive services coverage, the majority of which simultaneously provide for a religious accommodation.”[2] Id.
The Departments originally defined á religious employer as an employer that:
(1) has as its purpose the inculcation of religious values;
(2) primarily employs,■ persons who share its religious tenets;
(3) primarily serves persons who share its religious tenets; and
(4) is a non-profit organization under Section 6033(a)(1) and Section •6033(a)(3)(A)(i) or (iii) of the [Internal .Revenue] Code.[3]
Id. ■ The Departments also noted that HRSA’s “discretion to establish an exemption applies only to group health plans sponsored by certain religious employers and group health insurance offered in connection with such plans,” and thus “health insurance issuers in the individual health insurance market would not be covered under any such exemption.” Id. at 46,623-24 (emphasis added). The Departments formally adopted the four-part definition for exempted employers in 2012. They also created a one-year safe harbor for non-exempted, non-profit organizations with religious objections, and announced that they' would develop and propose changes *345 to the regulation that “would meet two goals—providing contraceptive coverage without cost-sharing to individuals who want it and accommodating non-exempted, non-profit organizations’ religious objections to covering contraceptive services. ...” 77 Fed. Reg. at 8,727.
The final rules regarding the Exemption went into effect in 2012. The Departments replaced the multifactor religious employer test with one definition, essentially the fourth prong of the previous test: “[A]n employer that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the [Internal Revenue] Code,” which addresses churches and their integrated auxiliaries. 78 Fed. Reg. at 39,874. The Departments noted that this new definition “continues to respect the religious interests of houses of worship and their integrated auxiliaries in a way that does not undermine the governmental interests furthered by the contraceptive coverage requirement.” Id. The Departments also stated:
Houses of worship and their integrated auxiliaries that object to contraceptive coverage on religious grounds are more likely than other employers to employ people of the same faith who share the same objection, and who would therefore be less likely than other people to use contraceptive services even if such services were covered under their plan.
Id. The Departments added that their statement about a religious employer’s likelihood to hire employees who. share religious beliefs opposing contraceptives was made in response to commenters concerned that the Exemption would “undermine the [Government's compelling interests in promoting public health and ensuring that women have equal access to health care....” 80 Fed. Reg. 41,318, 41,-325 (July 14, 2015); see also 78 Fed. Reg. at 39,887 (“Nor do the exemption for religious employers and the accommodations for eligible organizations undermine the [Gjovernment’s compelling interests.”). ..
In 2015, the Departments stated that the Exemption was “provided against the backdrop of the longstanding governmental recognition of a particular sphere of autonomy for houses of worship, such as the special treatment given to those organizations in the [Internal Revenue] Code.” 80 Fed. Reg. at 41,325. They continued:
This exemption ... is consistent with their special status under longstanding tradition in our society and under federal law, and is not a mere product of t]ie likelihood that these institutions hire coreligionists, Hiring coreligionists is not itself a determinative factor as to whether an organization should be accommodated or exempted from the contraceptive requirements.

Id.

B. Factual Background and Procedural History
1. Appellant Real Alternatives
Appellant Real Alternatives is a nonprofit, nonreligious, anti-abortion organization. It does not hold itself out as a religious entity, is not incorporated as such, and has not adopted any religious views or positions. Its primary purpose is to provide “life-affirming alternatives to abortion services,” and it offers pregnancy and parenting support programs as well as abstinence education services to women and families throughout Pennsylvania, Michigan, and Indiana. J.A. 92-93.
Real Alternatives avers that its views on human life are based on science, reason, and non-religious philosophical principles. Id. at 93. In addition to opposing abortion, Real Alternatives opposes the-use of all contraceptives because it considers these drugs to be “morally wrong.” Id. at 94.
*346 Real Alternatives administers its programs through networks of social service agencies, which Real Alternatives hires as subcontractors. It requires all of its subcontracting organizations to share its views and to agree not to provide or recommend contraceptives or abortion. It only hires employees who share the company's stance on contraceptives and abortion.
Since 2008, Real Alternatives has excluded contraceptive care from the health insurance plan it offers to its employees. Real Alternatives alleges that in 2014, because of the ACA, its insurer stopped omitting contraceptive care from coverage and, as a result, a new plan was offered to employees.[4] According to Real Alternatives, were it not for the ACA, its insurance provider would be willing to revert to providing a plan that omits contraceptive coverage. Real Alternatives avers that the Contraceptive Mandate violates the Equal Protection Clause and the Administrative Procedure Act (“APA”).
2. Appellants Real Alternatives Employees
Appellants Kevin I. Bagatta, Thomas A. Lang, and Clifford W. McKeown work for Real Alternatives (the “Real Alternatives Employees”). They are, respectively, the President, Vice President of Operations, and Vice President of Administration of Real Alternatives. They are the only full-time employees of Real Alternatives, and they aver that they share the company’s beliefs concerning contraceptive drugs. Each employee receives health insurance coverage through Real Alternatives, as do their wives and total of seven minor children, three of whom are female.
The Real Alternatives Employees aver that the Contraceptive Mandate violates the Church Amendment. They also aver that the Contraceptive Mandate violates their religious rights under RFRA. Specifically, they allege that their “sincerely held religious beliefs prohibit them from using, supporting, or otherwise advocating the use of abortifacients, or participating in a health insurance plan that covers such items for themselves or their families.” J.A. 123.
3. District Court Opinion
The District Court denied Real Alternatives’s motion for summary judgment in its entirety and granted the Government’s cross-motion for summary judgment in its entirety.[5] We find the District Court’s analysis informative and persuasive for the most part, and we review it here.
The District Court began by addressing Real Alternatives’s equal protection claim, finding in the first instance that Real Alternatives is not similarly situated to religious employers with comparable objections to the Contraceptive Mandate because, notwithstanding those objections, they do not share the same bases for those positions—namely, religion versus a single secular position. As discussed infra, the District Court raised and distinguished two relevant federal cases, Center for Inquiry, Inc., v. Marion Circuit Court Clerk, 758 F.3d 869 (7th Cir. 2014), and March for Life v. Burwell, 128 F.Supp.3d 116 (D.D.C. 2015). The District Court also focused on the “vast history of legislative protections [that] exist[ ] to *347 safeguard religious freedom,” and contrasted “[m]oral philosophies,” which it found “have been historically unable to enjoy the same privileged state.” J.A. 35. The District Court continued that even if Real Alternatives were similarly situated to a house of worship, respecting religious autonomy plainly constitutes a legitimate purpose to allow the classification to stand under rational basis review. The District Court examined the Government’s statements in the ACA regulations and found that it had sufficiently identified religious freedom as the purpose furthered by the Exemption. The District Court concluded its equal protection analysis by expressing concern that “[allowing adherence to a single moral belief ... to be indistinguishable from religion or an entire moral creed ... leads us down a slippery slope.” Id. at 42-43. It reasoned that “finding a singular moral objection to law on par with a religious objection” could very well lead to a flood of similar objections. Id. at 44.
Next, the District Court concluded that Real Alternatives’s claim that the Contraceptive Mandate is arbitrary and capricious “fail[s] for the same reasons that [its] Fifth Amendment equal protection claim lacked merit.” Id. at 49; see also id. at 48 (noting that “[t]he standard for determining whether an [APA] violation exists under the arbitrary and capricious standard is markedly similar to rational basis review”). The District Court also rejected Real Alternatives’s argument that the Contraceptive Mandate violates federal law—namely, the ACA and the Weldon Amendment of the Consolidated Security, Disaster Assistance, and Continuing Appropriations Act of 2009 (the “Weldon Amendment”)—as well as the Real Alternatives Employees’ claim that it violates the Church Amendment.
Finally, the District Court rejected the Real Alternatives Employees’ RFRA claim. It found that the burden at issue— maintaining an insurance plan that in-' eludes coverage for preventative services—was not substantial enough based on the Supreme Court’s approach in other RFRA cases. See J.A. 62 (first citing Bowen v. Roy, 476 U.S. 693, 703, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986) (holding that the Government could condition public benefits on the religiously prohibited act of providing a social security number without trampling on the beneficiary’s free exercise rights); then citing Lyng v. Nw. Indian Cemetery Protective Ass’n, 485 U.S. 439, 449, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988) (finding that building a road through sacred land did not violate the free exercise rights of those who believed in the land’s religious significance)). The District Court concluded in the alternative that, even if the Contraceptive Mandate did impose a substantial burden, it would still satisfy RFRA because it was the least restrictive means of furthering the Government’s compelling interest in a broadly applicable system of health care that advances public health and gender equality.
II. DISCUSSION
A. Standard of Review
We exercise plenary review over a district court’s grant of summary judgment, applying the same standard that the district court should have applied.[6] Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 276 (3d Cir. 2001). A court *348 grants summary judgment if “there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Fed. R. Civ. P. 56(a). There are no material facts in dispute; the questions raised by the parties are matters of law, which we review de novo. Shuman ex. rel. Shertzer v. Penn Manor Sch. Dist., 422 F.3d 141, 146 (3d Cir. 2005).
B. Equal Protection Claim[7]
Real Alternatives challenges the constitutionality of the Exemption’s scope, arguing that it violates the organization’s right to equal protection under the Fifth Amendment by exempting only religious employers and not other secular entities, such as itself, that oppose the requirements set forth in the Contraceptive Mandate. Real Alternatives urges that “[tjhere is no rational purpose to impose the Mandate on those who do not want the items and will not use them,” and contends that it.is excluded from the Exemption “simply because [it] is a ‘non-religious ethical group[ ]’ instead of a church.” Appellants’ Br. at 28 (final alteration in original). If churches receive a religious exemption, the argument goes, then so too must non-religious entities.
1. Legal Standard
To prevail on its equal protection claim, Real Alternatives must show that the Government has treated it differently from a similarly situated .party and that the Government’s explanation for the differing treatment does not satisfy the relevant level of scratiny. City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439-40, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). The parties agree, as they must, that rational basis review is the applicable standard. Thus, there must be “a rational relationship between the disparity of treatment and some legitimate governmental purpose.” United States v. Pollard, 326 F.3d 397, 407 (3d Cir. 2003) (quoting Heller v. Doe, 509 U.S. 312, 320, 113 S.Ct. 2637, 125. L.Ed.2d 257 (1993)). Rational basis review confers a “presumption of validity” on legislation, and “the plaintiff must negate every conceivable justification for the classification in order to prove that the classification is wholly irrational.” Brian B. ex rel. Lois B. v. Pa. Dep’t of Educ., 230 F.3d 582, 586 (3d Cir. 2000) (citing FCC v. Beach Commc’ns, 508 U.S. 307, 314-15, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)).
2. Analysis
We must, first determine whether Real Alternatives is similarly situated to a religious employer, such that the Exemption must be available to the group absent a legitimate rationale. There is no question it is not.
Real Alternatives leans on its company-mandated eschewal of contraceptives in an attempt to situate itself in lockstep with religious employers who can avail themselves of the Exemption, contending that it is in fact “more favorably” or “identically” situated to houses of worship because all of its employees by definition oppose contraceptive coverage. Appellants’ Br. at 28, 30. In making this claim, Real Alternatives invokes Center for Inquiry, in which the Seventh Circuit struck down an Indiana statute that permitted religious officials to solemnize marriages but prohibited their counterparts from secular groups from doing the same. 758 F-3d at 875. There, the court reasoned that “[a]n accommodation cannot treat religions favorably when secu *349 lar groups are identical with respect to the attribute selected for that accommodation.” Id. at 872.
• But Real Alternatives ignores 'key ■distinctions between that case and this one. Most notably, Real Alternatives disregards the stark contrast between itself and the appellant in Center for Inquiry, a humanist group that resembles a “religion[] in everything' except belief in a deity.” Id. at 871. Real Alternatives is a completely different type of entity, particularly because of its structure, aim, purpose, and function in its members’ lives. Indeed, Real Alternatives’s credo is limited 'to a one-sentence mission statement that says it “exists to provide life-affirming alternatives to abortion services throughout the nation.” J.A. 92. In Center for Inquiry, the humanist organization explicitly argued that “its methods and values play the same role in its members’ lives as religious methods and values play in the lives of adherents.” 758 F.3d at 871 (emphasis added). Real Alternatives makes no such claim, as it is solely concerned with administering programs that reflect its moral opposition to contraceptives and abortion. Thus, Center for Inquiry does not help Real Alternatives demonstrate that it is similarly, situated to a religious entity.
However, Real Alternatives does bear some resemblance to the plaintiffs in March for Life, the district court decision upon which it heavily relies. There, the District Court for the District of Columbia granted summary judgment to a non-profit, secular anti-abortion group on its equal protection challenge to the Contraceptive Mandate. We cannot accept the district court’s reasoning in that case. Relying almost exclusively, on Center for Inquiry, the district court found that the secular group at issue was' “similarly situated with regard to the precise attribute selected for accommodation”—specifically, a shared view that abortion is wrong. March for Life, 128 F.Supp.3d at 126 (emphasis omitted). But that court—and, by extension, Real Alternatives—ignored a crucial point: Unlike the corporation in Center for Inquiry, whieh involved a comprehensive belief system that happened not to be deity-centric, a secular anti-abortion group mirrors a single-issue interest group and not a religious organization that takes advantage of the Exemption. We agree with Judge Jones’s observation regarding the disparities between the two groups: “In every other respect, they are different. Real Alternatives is an employer, a company, and not a belief system ... and its' single mission statement cannot guide believers comprehensively throughout life as a religion ean.” J.A. 42; cf. United States v. Seeger, 380 U.S. 163, 187, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965) (accommodating a secular pacifist’s objections to the draft because his beliefs “occup[y] the same place in his life as the belief in a traditional deity holds in the lives of’ adherents to religion).
Real Alternatives is in no way like a religious denomination or one' of its non-theistic counterparts—not in structure, not in aim, not in purpose, and not in function. We do not doubt that Real Alternatives’s stance on contraceptives is grounded in sincerely-held moral values, but “religion is not generally confined to one question or one moral teaching; it has a broader scope.” Malnak v. Yogi, 592 F.2d 197, 209 (3d Cir. 1979) (Adams, J., concurring). We have accordingly noted three “guideposts” courts ought to use when identifying a religion:
First, a religion addresses fundamental and ultimate questions having to do with deep and imponderable matters. Second, a religion is comprehensive in nature; it consists of a belief-system as opposed to .an isolated teaching, Third, a religion *350 often can be recognized by the presence of certain formal and external signs.
Africa v. Pennsylvania, 662 F.2d 1025, 1032 (3d Cir. 1981). We thus agree with Amici Curiae that “Real Alternatives is functionally similar not to a church, but to the countless nonreligious 501(c)(3) nonprofit organizations that take morally informed positions on some discrete set of issues,” such as the NAACP and the National Organization for Marriage.[8] Amici Curiae Br. at 16.
Real Alternatives overemphasizes its shared opposition to contraceptive coverage while inexplicably dismissing the Government’s repeated statements that the Exemption “was provided against the backdrop of the longstanding governmental recognition of a particular sphere of autonomy for houses of worship.... ” 80 Fed. Reg. at 41,325. But framing the Exemption—or any religious exemption for that matter—so broadly as to encompass any employer who disagrees with any aspect of an underlying law lies in direct contradiction to the Supreme Court’s refusal to broaden religion-based exemptions in similar contexts. See United States v. Lee, 455 U.S. 252, 260-61, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982) (in a Social Security-related matter, rejecting a claim to extend a limited exemption because “[c]on-fíning the ... exemption ... provided for a narrow category which was readily identifiable,” and noting that “every person cannot be shielded from all the burdens incident to exercising every aspect of the right to practice religious beliefs”). Permitting Real Alternatives to qualify for the Exemption would similarly run afoul of this country’s vast history of legislative protections that single out and safeguard religious freedom but not moral philosophy. See Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos, 483 U.S. 327, 338, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987) (“Where, as here, [Government acts with the proper purpose of lifting a regulation that burdens the exercise of religion, we see no reason to require that the exemption comes packaged with benefits to secular entities.”);[9] Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc (“RLUIPA”) (requiring religious *351 accommodation for zoning and land use regulations); Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1003(b)(2) (exempting “church plants]” from retirement-plan regulations); Internal Revenue Code, 26 U.S.C. §§ 6033(a)(3)(A)®, (iii) (carving out “churches, their integrated auxiliaries, .,. conventions or associations of churches,” and “the exclusively religious activities of any religious order” from a tax-filing requirement); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-l(a) (requiring that employers not discriminate on the basis of religion). If mere disagreement, however vehemently felt, were sufficient to bring an equal protection claim, virtually any law implicating religion would be rendered moot because the exemption would be too easy to invoke.[10] Cf. Cutter v. Wilkinson, 644 U.S. 709, 724, 126 S.Ct. 2113, 161 L.Ed.2d 1020 (2006) (acknowledging that “all manner of religious accommodations would fall” if the Court struck down one law that implicated religion because of the similarities among religious accommodation laws).
Finally, even if Real Alternatives were deemed similarly situated to a religion, the group’s challenge would still fail because of the historic principle of respect for the autonomy of genuine religions. This principle provides the legitimate purpose for the preferential treatment of religious organizations. The Exemption “provide[s] for a religious accommodation that respects the unique relationship between a house of worship and its employees in ministerial positions.” 76 Fed. Reg. at 46,623. It “was provided against the backdrop of the longstanding governmental recognition of a particular sphere of autonomy for houses of worship,” is “consistent with their special status under longstanding tradition in our society and under federal law, and is not a mere product of the likelihood that these institutions hire coreligionists.” 80 Fed. Reg. at 41,325. Real Alternatives brazenly dismisses these statements as disingenuous.[11] In doing so, it misses a crucial point about rational basis review: It is “constitutionally irrelevant whether this [legitimate] reasoning in fact underlay the legislative decision” because this Court has never insisted that a legislative body articulate its reasons for enacting a statute. U.S. R.R. Ret. Bd. v. Fritz, 449 U.S. 166, 179, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980); see also Beach Commc’ns, 508 U.S. at 318, 113 S.Ct. 2096 (applying Fritz to an admin *352 istrative action). In any event, the attribute Congress selected for classjficatioii is, not opposition to contraceptives; it is .star, tus as a house of worship and based on the long-established governmental desire to respect the autonomy of houses of worship regardless of their particular stance on contraceptives.
It is beyond dispute that respecting church autonomy is a legitimate purpose—one that not only satisfies rational basis review but also is enshrined in the constitutional fabric of this country. Principles of noninterference trace back to “the text of the First Amendment itself, which gives special solicitude to the rights of religious organizations,” and recognizes their “independence from secular control or manipulation—in short, [their] power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC, 565 U.S. 171, 132 S.Ct. 694, 704, 706, 181 L.Ed.2d 650 (2012) (quoting Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am., 344 U.S. 94, 116, 73 S.Ct. 143, 97 L.Ed. 120 (1952)) (internal quotation marks omitted). Even when noninterference is not strictly required, the Government has discretion to grant certain religious accommodations subject to constitutional limitations.[12] See Cutter, 544 U.S. at 720-22, 125 S.Ct. 2113. These accommodations- may be extended to houses of worship and religious denominations without' applying to all nonprofit entities in order to “alleviate significant governmental interference with the ability of religious organizations to define and carry out them religious missions.”[13] Amos, 483 U.S. at 335, 107 S.Ct. 2862; see also Walz v. Tax Comm’n, 397 U.S. 664, 676, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) (upholding a property tax exemption for houses of worship); Hosanna-Tabor, 132 S.Ct. at 706 (finding a “special rule for ministers grounded in the Religion Clauses themselves”).
We reiterate, however, that Real Alternatives cannot satisfy the first prong of a successful equal protection claim. Finding all single-issue non-profit organizations to be similarly situated to houses of worship based on their adherence to a shared position on one issue would expand religious exemptions beyond what is constitutionally required. That a legitimate purpose of the highest order—respect for religious autonomy—justifies the Exemption only underscores the inevitability of' our conclusion; We therefore find that Real Alternatives’s equal protection claim fails as a matter of law.
*353 C. APA Claim
Real Alternatives asserts two claims under the APA: (1) the Contraceptive Mandate is arbitrary and capricious because it does not serve a rational governmental purpose as applied to Real Alternatives, an organization that employs only people who oppose contraceptive coverage; and (2) it violates the Constitution and federal law. Both claims lack merit.
1. Legal Standard
A reviewing court may “hold unlawful and set aside agency action” that is “(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law”- or “(B) contrary to constitutional right, power, privilege, or immunity.” 5 U.S.C. § 706(2)(A)-(B).
We have held that the standard for determining whether an APA violation exists under the arbitrary and capricious standard is substantially similar to rational basis review:
Agency action is arbitrary and capricious if the agency offers insufficient reasons for treating similar situations differently. If [an] agency makes an exception in one case, then it must either make an exception in a similar case or point to a relevant distinction between the two cases. Review of an equal protection claim in the context of agency action is similar to that under the APA. That is, an agency’s decision must be upheld if under the Equal Protection Clause, it can show a rational basis for its decision. As such, the equal protection argument can be folded into the APA argument, since no suspect class is involved and the only question is whether the ... treatment of [appellees] was rational (i.e.,. not arbitrary and capricious).
Nazareth Hosp. v. Sec’y U.S. Dep’t of Health & Human Servs., 747 F.3d 172, 179-80 (3d Cir. 2014) (alteration in original) (citations and internal quotation marks omitted) (emphasis added).
2, Analysis
Because we' find that Real Alternatives’s equal protection claim fails; we need not reexamine' its arbitrary and capricious claim, which is subject to the same standard of review. Id.
Real Alternatives argues that the Contraceptive Mandate also violates the APA because it infringes on. two. other federal laws: the ACA and the Weldon Amendment. The Real Alternatives Employees argue that the Contraceptive Mandate also violates the Church Amendment and, therefore, the APA. We disagree with these contentions and find no violations. We address each law in turn.
a. ACA
The ACA states that none of its provisions “shall be construed to require a qualified. health plan to provide coverage of [abortion] services as part of its essential health benefits for any plan year.” 42 U.S.C. § 18023(b)(l)(A)(i). Real Alternatives argues that the Contraceptive Mandate violates this provision by “requiring coverage of certain ‘FDA-approved contraceptives’ which act as abortifacients, in that they cause the demise of human embryos after conception and before and/or after implantation in the uterus.” Appellants’ Br, at 57. Real Alternatives does not cite any statutory or regulatory definition of abortion that includes contraceptives.[14]
*354 However, longstanding FDA regulations treat pregnancy as “the period of time from implantation until delivery,” 45 C.F.R. § 46.202(f), and categorize drugs that may prevent implantation as contraceptives rather than as abortifaeients. 62 Fed. Reg. 8,610, 8,611 (Feb. 25, 1997) (“Emergency contraceptive pills are not effective if the woman is pregnant; they act by delaying or inhibiting ovulation, and/or altering tubal transport of sperm and/or ova (thereby inhibiting fertilization), and/or altering the endometrium (thereby inhibiting implantation).”). Further, we defer to the Government’s definition because “this Court will normally accord particular deference to an agency interpretation of longstanding duration.” Barnhart v. Walton, 535 U.S. 212, 220, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002) (internal quotation marks omitted). Thus, we conclude that the Contraceptive Mandate does not require coverage for abortion services and that Real Alternatives’s claim to the contrary fails.
b. Weldon Amendment
Real Alternatives raises a similar claim based on the Weldon Amendment, which requires that no funds provided by the ACA’s underlying appropriations bill be made available to a federal agency or program that “subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions.” Pub. L. No. 112-74, §§ 506, 507, 125 Stat. 786, 1111-12 (Dec. 23, 2011). This claim fails for the reasons stated in the preceding section.[15]
c. Church Amendment
The final APA claim asserts a violation of the Church Amendment, which prohibits an individual from being required to “perform or assist in the performance of any part of a health service program or research activity funded ... by the Secretary of [HHS] if his performance or assistance ... would be contrary to his religious beliefs or moral convictions.”[16] 42 U.S.C. § 300a-7(d). This claim fails for lack of standing. The Real Alternatives Employees purchase their health insurance from a company in the health insurance market, not from HHS or an HHS-administered health insurance program that falls under the purview of the Church Amendment. See Geneva Coll. v. Sebelius, 929 F.Supp.2d 402, 449-50 (W.D. Pa. 2013) (where individuals obtain health insurance through their employer, who in turn purchases coverage from the private health insurance market (and not HHS), the Church Amendment is not implicated) (citing Ass’n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)).
D. RFRA
We now turn to the RFRA claim, which presents a question of first impression for this Court: whether employees, who oppose contraceptives on religious grounds but work for secular employers, experience a substantial burden on their *355 religious exercise when the Government regulates group health care plans and health care insurance providers by requiring them to offer health insurance coverage that includes coverage for services the employees find incompatible with their religious beliefs. This claim is distinct from an employer’s RFRA claim objecting to the mandated provision of contraceptive services that was found to be meritorious in Burwell v. Hobby Lobby Stores, Inc., — U.S. -, 134 S.Ct. 2751, 2775, 189 L.Ed.2d 675 (2014).[17]
Under RFRA, the “Government may substantially burden a person’s exercise of religion only if it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.” 42 U.S.C. § 2000bb-1(b) (emphasis added). The “exercise of religion” constitutes “any exercise of religion, whether or not compelled by, or central to, a system of religious belief.” 42 U.S.C. § 2000cc-5(7)(A).
Congress enacted RFRA in 1993 in response to the Supreme Court’s decision in Employment Division v. Smith, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), which overruled the earlier method of analyzing free exercise claims used in Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), and Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). See Geneva, 778 F.3d at 430. The earlier decisions used a balancing test that took into account whether the challenged action imposed a substantial burden on the practice of religion, and if it did, whether it was needed to serve a compelling governmental interest. Id. Smith rejected this test because applying it whenever a person objected on religious grounds to the enforcement of a generally applicable law “would open the prospect of constitutionally required religious exemptions from civic obligations of almost every conceivable kind.... ” 494 U.S. at 888, 110 S.Ct. 1595.
Courts look to pre-Smith free exercise jurisprudence when assessing RFRA claims. See Hobby Lobby, 134 S.Ct. at 2772. The Supreme Court has characterized RFRA as “adopt[ing] a statutory rule comparable to the constitutional rule rejected in Smith.” Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 424, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006). RFRA may be applied to situations not previously addressed under pre-Smith jurisprudence. See Hobby Lobby, 134 S.Ct. at 2772 (“It is simply not possible to read these provisions as restricting the concept of the ‘exercise of religion’ to those practices specifically addressed in our pr e-Smith decisions.”).
1. Legal Standard
Religious exercise is impermis-sibly burdened when government action compels individuals “to perform acts undeniably at odds with fundamental tenets of their religious beliefs.” Yoder, 406 U.S. at 218, 92 S.Ct. 1526 (emphasis added). Accordingly:
*356 Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it ■ denies such a benefit because of conduct mandated by religious belief, thereby ■.putting substantial pressure on an-adherent .to modify his behavior and to violate his beliefs, a burden upon religion exists.
Thomas v. Review Bd., 450 U.S. 707, 717-18, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) (emphasis added). This Court has found “a substantial burden exists where: 1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available ... versus abandoning one of the precepts of his religion in order to receive a benefit; OR 2) the [G]overnment puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs.” Mack v. Warden Loretto FCI, 839 F.3d 286, 304 (3d Cir. 2016).
Important principles circumscribe the RFRA inquiry, and it is for the reviewing court to determine whether a burden is “substantial.” We thus reiterate a self-evident principle that we set forth in Geneva: “While the Supreme Court reinforced in Hobby Lobby that we should defer to the reasonableness of the [RFRA claimant’s] religious beliefs, this does not bar our objective evaluation of the nature of the claimed burden and the substantiality of that burden on the [claimant’s] religious exercise.”[18] 778 F.3d at 436 (emphasis added). As such, “[w]hether a burden is ‘substantial’ under RFRA is a question of law, not a question of fact.” Id. at 442 (citing Mahoney v. Doe, 642 F.3d 1112, 1121 (D.C. Cir. 2011)); see also Kaemmerling v. Lappin, 553 F.3d 669, 679 (D.C. Cir. 2008) (“Accepting as true the factual allegations that [plaintiffs] beliefs are sincere and of a religious nature—but not the legal conclusion, cast as a factual allegation, that his religious exercise is substantially burdened....”); cf. Hobby Lobby, 134 S.Ct. at 2775 (“Because RFRA applies in these cases, we must next ask whether the HHS contraceptive mandate ‘substantially burden[s]’ the exercise of religion.”) (citing 42 U.S.C. § 2000bb-1(a)) (alteration in original).
RFRA’s legislative history underscores the requirement that the burden be substantial. The version of RFRA initially introduced in the House of Representatives provided only that “Government shall not burden a person’s exercise of religion” unless the burden satisfied strict scrutiny. H.R. 1308, 103d Cong. § 3 (1993). It was only later in the enactment process that it was modified to include the word “substantially” immediately before “burden.” 42 U.S.C. § 2000bb-1(a)-(b); Little Sisters of the Poor Home for the Aged v. Burwell, 794 F.3d 1151, 1176 (10th Cir. 2015) (“Con *357 gress added the word ‘substantially’ before passage to clarify that only some burdens would violate the act. 139 Cong. Ree. S14352 (daily ed. Oct. 26, 1993) (statements of Sen.: Kennedy and Sen. Hatch).... If plaintiffs could assert and establish that a burden is ‘substantial’ without any possibility of judicial scrutiny, the word ‘substantial’ would become wholly devoid of independent meaning.”), vacated and remanded sub nom, Zubik, 136 S.Ct. at 1561. This important change made it explicit that RFRA would provide relief only from “substantial” government burdens on religious exercise, not from all government burdens.[19] The Dissent would have us read “substantial” out of the statute, revert to a never-enacted version of RFRA, and supplant our charge to conduct judicial review of a RFRA claim with automatic deference to the claimant.[20] We will not.[21]
There is no substantial burden if the governmental action does not coerce the individuals to violate their religious beliefs or deny them the “rights, benefits, and privileges enjoyed by other citizens”— even if “the challenged Government action would interfere significantly with private persons’ ability to pursue spiritual fulfillment according to their, own religious beliefs.” Lyng, 485 U.S. at 449, 108 S.Ct. 1319. Nor can a party use RFRA to “require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens.” Bowen, 476 U.S. at 699, 106 S.Ct. 2147. “Congress has required qualitative assessment of the merits of .., RFRA claims.” Geneva, 778 F.3d at 435. At the same time, we must be careful to conduct only a review into the substantiality of the religious burden and not to question the reasonableness of the religious belief itself. See Hobby Lobby, 134 S.Ct. at 2778 (RFRA does not permit courts to address “whether the religious belief asserted in a RFRA case is reasonable”). Courts aré not to accept every allegation of substantial burden. To the contrary, RFRA’s demand for judicial *358 review has been recognized by the Supreme Court,[22] by this Court in Geneva, and by virtually all of our sister circuits, which have not hesitated to examine whether an alleged burden is sufficiently “substantial” under RFRA.[23] Rather than confront this precedent, our dissenting colleague would prefer to ignore the import, even the existence, of the “substantial” qualifier in the RFRA test. The Dissent reduces our position to say that “[religious beliefs are not being burdened in any meaningful sense, so people should just stop complaining.” Dissent Op. at 367. But whether the alleged burden is “meaningful”—or, more accurately, “substantial”— is not a question that can be so easily dismissed with a reductionist turn of phrase. To the contrary, it is the very essence of a RFRA claim, the threshold inquiry posed to any individual attempting to bring a successful RFRA claim, and it is undoubtedly for the court to answer whether it has been satisfied.[24] Turning to the burden alleged by the Real Alternatives Employees, we will now do just that.
*359 2. Analysis
RFRA centers on the intersection between the specific conduct in which the objector is forced to engage and his or her religious exercise, and that is where we begin our analysis. The Real Alternatives Employees characterize their purchase of insurance as somehow enabling the provision of contraceptives, thereby substantially burdening their religious exercise. They allege that their “sincerely held religious beliefs prohibit them from [(1)] using, [ (2) ] supporting, or otherwise [ (3) j advocating the use of abortifacients, or [ (4) ] participating in a health insurance plan that covers such items for themselves or them families.” J.A. 123 (emphasis added). We address each enumerated allegation in turn, and we conclude that the Real Alternatives Employees have failed to demonstrate that the Contraceptive Mandate forces them to violate their religious beliefs.
The act complained of is the signing on to coverage followed by the request for reimbursement of services chosen. That basic scheme is the same for any individual whose employer provides him or her with insurance: The plan deems the employee eligible to be reimbursed for hundreds of different services, and that employee can take advantage of that eligibility as he or she sees fit. Should the employee opt to use a particular service, he or she fills out a form and asks to be paid back for costs incurred. In the end, the employee uses a covered service, or not; either way, there is no requirement to support or advocate for whatever service he or she, or others, selects. Checking off a box to be eligible for reimbursement of services—services of the employee’s choosing—in no way indicates, let alone suggests, support or advocacy for that service. The disconnect between the use of any one service and the use of contraceptives is arguably even greater—and it calls into question the “substantiality” of the purported burden. After all, a substantial burden on the exercise of religion exists only where the Government “demands that [an individual] engage in conduct that seriously violates [his or her] religious beliefs,” Hobby Lobby, 134 S.Ct. at 2775 (emphasis added), and such engagement, as discussed in the following sections, is clearly lacking here.
We are then left with the fourth proscribed conduct that is central to the RFRA claim: participation. As with their equal protection claim, the Real Alternatives Employees rely primarily on March for Life for key support, as the district court there reasoned that “participating in” a health insurance plan, by its very nature, effects a substantial change in behavior because “health insurance does not exist independently of the people who purchase it.” 128 F.Supp.3d at 129. There, the district court found that, “[g]iven the nature of health insurance, [employees] do play a role in the health care plans that provide contraceptive coverage.” Id. While characterizing what employees do by subscribing to a plan as “playing a role,” March for Life would have us position this fact pattern in lockstep with Hobby Lobby. But do employees really “play a role?” The Real Alternatives Employees, along with the Dissent, assume the affirmative, relying on March for Life’s treatment of the concepts “buy into” and “participate in” as interchangeable. But they are not.
Subscribing to an insurance plan involves no real “participation,” just as there is no active “participation” when subscribing to a magazine or joining AARP or enrolling in a credit card that has membership benefits. These are all packages that involve a one-time enrollment, followed by essentially passive eligibility for certain services that the member opts in or out of. *360 By declaring that an insurance plan does not exist without participants, the district court in March for Life somehow equates the plan with the employees as if. they actively, engage in a way that—'were it factual—might be objectionable. Let us be clear: There is. no “participation” in the real sense of the word. The employee pays for coverage and thereby avails him or herself of the ability to be reimbursed for services. But payment for the ability to have coverage does not give an employee an active “role” in the underlying plan. The insurance company offers a package of health benefits, including certain benefits mandated by the Government. The plan does not assure the availability of specific services. Those services are for the employee to seek out and use—or not. And the employee, by merely subscribing to that plan in the first instance, is even less directly related to whatever specific services he or she, or anyone else, might or might not use later on.[25] The employees’ actions under the ACA are mediated by the insurance company, and any link between the decision to sign up for insurance on the one hand and the provision of contraceptives to a particular individual on the other is “far too attenuated to rank as substantial.” Hobby Lobby, 134 S.Ct. at 2798-99 (Ginsburg, J. dissenting).
This attenuation is fatal to the RFRA claim. Gases finding a substantial burden under RFRA have consistently done so where, unlike here, there is a burden that interfered with the claimants’ exercise and religion is directly implicated by federal action. See Hobby Lobby, 134 S.Ct. at 2751 (provision required employer-plaintiffs to provide contraceptive coverage in any group plan that they provided to their employees); Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 527-28, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (ordinance prohibited plaintiffs from sacrificing animals); Lee, 455 U.S. at 254, 102 S.Ct. 1051 (statute required plaintiffs to pay Social Security taxes); Thomas, 450 U.S. at. 712, 101 S.Ct. 1425 (law denied plaintiff unemployment benefits); Sherbert, 374 U.S. at 399-400, 83 S.Ct. 1790 (same); Yoder, 406 U.S. at 207, 92 S.Ct. 1626 (law required plaintiffs to send their children to school); see also Civil Liberties for Urban Believers v. City of Chi., 342 F.3d 752, 761 (7th Cir. 2003), (holding, in the context of RLUIPA, that “a substantial burden on religious exercise is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise ... effectively impracticable”), reh’g en banc denied; cf. Fernandez v. Mukasey, 520 F.3d 965, 966 (9th Cir. 2008) (per *361 curiam) (“Petitioners have failed to establish that the [statutory provision at issue] places a substantial burden on their religious exercise under RFRA.... [T]he connection between [the statutory requirement and their religious exercise] is too attenuated to create a substantial burden on petitioners’ religious exercise.”) (footnote omitted).
These cases underscore that the connection between the conduct and the religious belief matters,[26] for “the law distinguishes between direct participation and remote facilitation, treating the former as compelling and the latter as negligible.”[27] Amy J. Sepinwall, Conscience and Complicity: Assessing Pleas for-Religious Exemptions in Hobby Lobby’s Wake, 82 U. CHI. L. REV. 1897, 1938 (2015). The Government is not mandating an endorsement, or preventing someone from sacrificing an animal as part of a religious ritual, or anything of that nature. The Contraceptive Mandate increases the number of choices an employee has when he or she purchases health insurance—in this case, broadening the availability of services that an employee might or might not access. But that is all it is: a choice, It is' still up to the employee to decide what to do with those options, to seek out relevant providers,, to submit claims for reimbursement for the service he or she selects, and so on. The act complained of—-the filling out of a form that triggers eligibility for reimbursement for services the employee chooses to use (or not)—has not changed, and it in no way amounts to the sort of “substantial” burden consistently found contrary to RFRA.[28] And the possibility that others might avail themselves of services that the employees find objectionable is no more burdensome than filling out the form in Geneva,[29] Unlike in Hobby Lobby, *362 which literally required the objecting employers to “arrange for” contraceptive coverage in a way that effectively amounted to sponsorship, 134 S.Ct. at 2775, the Contraceptive Mandate requires nothing of the employees that implicates their religious beliefs as stated. There is a material difference between employers arranging or providing an insurance plan that includes contraception coverage—so that employees can avail themselves of that benefit—and becoming eligible to apply for reimbursement for a service of one’s choosing.[30]
The Real Alternatives Employees ultimately fail to grasp that one size does not fit all: The fact that the Government may require insurers to offer coverage for expenditures for certain services that some might find objectionable on religious grounds cannot form the basis of requiring the Government to adjust its programs on *363 behalf of all employees. The categories of services that could offend religious beliefs is wide-ranging and, as discussed infra, denying reimbursement for such services to all on the basis of the religious objections of some would be neither desirable nor administrable. It is certainly not mandated under RFRA, which has long protected against substantial, usually direct, burdens on the individual bringing the claim, not those utterly disconnected from the claimants themselves.
In fact, the only behavior that the Contraceptive Mandate governs is the behavior of a third party, the insurer. And as Amici Curiae rightly note, RFRA does not afford the Real Alternatives Employees a “religious veto over governmental action that affects them only incidentally and does not coerce them to violate their faith.” Amici Curiae Br. at 24. This principle, that a RFRA claimant show that a penalty or benefit be more than incidental in order to amount to a substantial injury, is well-rooted in RFRA jurisprudence. In Lyng, the Supreme Court rejected the RFRA claimants’ free exercise claim because the injury only amounted to an incidental effect. 485 U.S. at 453, 108 S.Ct. 1319. The Court held that the indirect burden eases “cannot imply that incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs, require [Government to bring forward a compelling justification for its otherwise lawful actions.” Id. at 450-51, 108 S.Ct. 1319. As discussed at length supra, in passing RFRA, Congress bolstered Lyng’s reading of the Free Exercise Clause with RFRA’s text[31] and legislative history.[32] We incorporated this logic in Geneva, finding that “free exercise jurisprudence instructs that we are to examine the act the [claimants] must perform—not the effect of that act—to see if it burdens substantially the [claimants] religious exercise,” 778 F.3d at 440, and we reinforce that conclusion today.[33]
*364 RFRA precedent further instructs that the Real Alternatives Employees’ requested remedy, lifting a penalty imposed on a third party—the insurer—would run afoul of this Court’s and others’ findings that individuals cannot use RFRA to compel the Government to structure its relations with a third party in a certain way. “The Supreme Court has consistently rejected the argument that an independent obligation on a third party can impose a substantial burden on the exercise of religion in violation of RFRA....” Geneva, 778 F.3d at 440-41 (outlining cases); see also Estate of Thornton v. Caldor, Inc., 472 U.S. 703, 710, 105 S.Ct. 2914, 86 L.Ed.2d 557 (1985) (recognizing as “a fundamental principle of the Religious Clauses” that “[t]he First Amendment ,;. gives no one the right to insist that in pursuit of then-own interests others must conform their conduct to his own religious necessities”) (omission in original) (internal quotation marks omitted); E. Texas Baptist Univ. v. Burwell, 793 F.3d 449, 459 (5th Cir. 2015) (“RFRA confers no right to challenge the independent conduct of third parties....”), vacated and remanded sub nom. Zubik, 136 S.Ct. at 1561; Priests for Life, 772 F.3d at 246 (“[N]o RFRA right to be free from the unease, or even anguish, of knowing that third parties are legally privileged or obligated to act in ways their religion abhors.”); Ave Maria Found. v. Sebelius, 991 F.Supp.2d 957, 965-66 (E.D. Mich. 2014) (“[A] great number of religious objections based on third-party actions are dismissed simply because the plaintiff is not pressured .to act in any way.”) (citing cases).
Before we end our discussion of the “substantial burden” inquiry under RFRA, we note that while the Dissent would downplay the workability concerns exposed by the District Court regarding the ramifications of finding a substantial burden here, we believe they are real. As one Seventh Circuit Court of Appeals jurist observed, “contraceptive care is by no means the sole form of health care that implicates religious concerns.” J.A. 66 (citing Grote v. Sebelius, 708 F.3d 850, 866 (7th Cir. 2013) (Rovner, J., dissenting)). Medical treatments that some might view as objectionable are as varied as they are numerous. Examples that are by no means exhaustive include artificial insemination and other reproductive technologies; genetic screening and counseling; preventative and remedial treatment for sexually transmitted diseases; sex reassignment; vaccination; organ transplant from deceased donors; blood transfusions; euthanasia or physician-assisted suicide; and so on. See id. (noting that “in some religions, virtually all conventional medical, treatments[ ] are objectionable”). By extension, “[a] finding that coverage for one set of objectionable services constitutes a substantial burden would imply that coverage for all such services imposes a substantial burden”—an implication that would “render the health care system totally unworkable.” Id.; see also Navajo Nation, 535 F.3d at 1072 (“[Gjovernment simply could not operate if it were required to satisfy *365 every citizen’s . religious needs and desires.”).
The Dissent parrots March for Life’s dismissal of these workability concerns, pointing to the incentives of insurance companies as safeguards against “a world in which the [Government would require third-party insurance companies to provide coverage in every possible form requested by an individual on religious grounds.”[34] March for Life, 128 F.Supp.3d at 132; see also Dissent Op. at 382. But, the incentives argument is off-point • and not curative of our concerns. The Dissent transplants March for Life’s discussion of insurance companies’ incentives—reviewed there in the context of deciding whether the Government satisfied the third “least restrictive” prong of the RFRA analysis—into its analysis of the first “substantial burden” prong. And even if insurance companies’ incentives were relevant,, they would still not satisfy our concerns. The district court’s presumption in March for Life, the backbone of the Dissent’s rebuttal here, is that “[ijinsurance companies have every incentive to maintain a sustainable and functioning market,...” Dissent Op. at 382 (alteration in original) (quoting 128 F.Supp.3d at 132). This is a false premise: Insurance companies have an interest in a sustainable and functioning insurance market only to the extent that it is profitable for them.[35] Nor is the identification of an insurance company that is allegedly willing to provide a satisfactory plan relevant to our analysis.-The RFRA test does not ask whether a claimant is able to offset a purported burden with an alternative scheme of his or her choosing, and neither the Real Alternatives Employees nor the Dissent have pointed to any case indicating otherwise.[36]
Our inquiry today urges an examination of. the claimed substantial nature of an alleged burden. This approach contrasts sharply, with that of the district court in March for Life, which assumed—without any analysis whatsoever—the “substantial” nature of the so-called burden of “participating” in an insurance plan. Id. at 129-30. Yet we arguably need not even address the issue of whether the employee’s choice is coercive when the so-called burden of signing up for coverage that might enable themselves or others to be reimbursed for various services is clearly not substantial. No matter how sincerely held their beliefs may be, we cannot accept at face value that subscribing to the plan imposes a “substantial burden.” Surely the word “substantial” is a matter of subjectivity, not as to genuineness of belief but as to the nature and extent to which religious exercise is hampered or restrained by the conduct in question. It is, after all, an imperative safeguard, else religious beliefs would invariably trump government action.
*366 In characterizing the facts in an inaccurate manner, sidestepping the statutory text, legislative history, and controlling case law entirely, the Real Alternatives Employees urge us to put an active gloss on what is essentially a passive commercial monetary decision: enrolling in a plan so as to be reimbursed for services of which one later chooses to avail him or herself. Viewing the situation for what it is compels us to conclude that whatever burden there might be, it is certainly not substantial.
Because we conclude that the Real Alternatives Employees have not—and cannot—show that the Contraceptive Mandate imposes a substantial burden on their religious beliefs, we need not reach the question of whether the Contraceptive Mandate is the least restrictive means of furthering a compelling governmental interest.[37]
III. CONCLUSION
For the foregoing reasons, we will affirm the District Court’s order denying Appellants’ motion for summary judgment in its entirety and granting the Government’s cross-motion for summary judgment in its entirety.

. Grandfathered health plan coverage is that which has existed continually prior to March 23, 2010 and has not undergone any of several specified changes since that time. 29 C.F.R. § 2590.715-1251 (2010).

. Though the language here refers to religious accommodation, these statements refer to what would ultimately become the exemption given to religious employers under the ACA. The Departments established a separate accommodation for certain employers, addressed supra, that is not at issue in this litigation.

. Section 6033 of the Internal Revenue Code refers in relevant part to “churches, their integrated auxiliaries, and conventions or associations of churches,” and "the exclusively religious activities of any religious order.” 26 U.S.C. § 6033(a)(3)(A)(i).

. Because the original insurance plan was terminated, it does not qualify for grandfathered status.

. The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331, 1361, 2201, & 2202; 42 U.S.C. § 2000bb-l; and 5 U.S.C. § 702. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

. When the parties were before the District Court, Real Alternatives moved for summary judgment and the Departments moved to dismiss ot, in the alternative, for summary judgment. The District Court treated the Departments’ motion as one for summary judgment, and we will review accordingly.

. The equal protection and APA claims are brought both by Real Alternatives the entity and by Bagatta, Lang, and McKeown, the orgapization’s three full-time employees. For the sake of concision,»we will refer to this group of appellants as "Real Alternatives.”

. We further agree with Amici Curiae that while commitment to an anti-abortion platform may be important to the people who hold them, that commitment is "not a religion in any legally or theologically accepted sense; and organizations do not become quasi-churches for equal-protection purposes merely by espousing a commitment of that sort.” Amici Curiae Br. at 15; see also Malnak, 592 F.2d at 208-10 (Adams, J., concurring) (defining nontheistic belief system as "religion” if it (1) deals with questions of "ultimate concern”; (2) provides answers that speak to comprehensive and ultimate truth; and (3) has formal characteristics analogous to those of traditional religions); Wash. Ethical Soc’y v. District of Columbia, 249 F.2d 127, 128 (D.C. Cir. 1957) (finding nontheistic ethical society that had regular Sunday meetings, "leaders” who preached to members and provided spiritual guidance, and ceremonies for naming, marrying, and burying members qualified for tax exemption as church); Fallon v. Mercy Catholic Med. Ctr. of Se. Pa., 200 F.Supp.3d 553, 562 n.4 (E.D. Pa. 2016) (distinguishing between plaintiff’s beliefs, which "consisted] solely of his ‘conscience’ and personal moral code,” and the "structural characteristics” of secular moral systems that are equivalent to religion except for non-belief in God); Fellowship of Humanity v. Cty. of Alameda, 153 Cal.App.2d 673, 315 P.2d 394, 409-10 (1957) (finding that nontheistic fellowship qualified for tax exemption as church because "it is conceded that in all respects the Fellowship’s activities are similar to those of the theistic groups, except for their belief or lack of belief in a Supreme Being”).

. We do not find persuasive Real Alternatives’s belabored efforts to distinguish Amos, and we agree with the District Court that the Supreme Court’s holding in that case is applicable here.

. We share the concerns of Amici Curiae that if such disagreement were enough to substantiate an equal protection claim, there would also be strong disincentives from granting any religious exemption because of how easy it would be to utilize or to extend it, thereby seriously undermining countless legislative and regulatory programs. Relatedly, there would be immense pressure to repeal the thousands of religious accommodations that have been enacted at the federal, state, and local levels for fear that they would become vehicles to avoid compliance by anyone who dislikes the underlying laws.

. Without any supporting evidence, Real Alternatives repeatedly contends that the Government is asking the Court “to ignore the actual explanation in its regulations," i.e., the likelihood of religious employees using contraceptives, "and instead to suppose that the exemption was offered solely because of the ‘church character’ of some religious employers.” Appellants' Reply Br. at 7. This theory hinges on the Government’s acknowledgment that “employees of employers availing themselves of the exemption would be less likely to use contraceptives even if contraceptives were covered under their health plans." 77 Fed. Reg. at 8,728. While we agree that likelihood of use would not alone satisfy rational basis review, that statement was part of the Government’s explanation that the Exemption "does not undermine the overall benefits” of the Contraceptive Mandate. Id. It does not negate or in any way undermine the actual and legitimate purpose of the historic respect for religion put forth by the Government.

. The First Amendment prohibits the Government from inserting itself in theological disputes, appointments of ministers, or questions of distribution of church property;. the Government may- not dictate to houses of worship what to believe or how to structure their relations with clergy to implement and teach those beliefs. See, e.g., Hosanna-Tabor, 132 S.Ct. at 706 (employment decisions for ministers); Serbian E. Orthodox Diocese for the U.S. & Can. v. Milivojevich, 426 U.S. 696, 713-14, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976) (internal theological disputes and religious tribunals); Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church, 393 U.S. 440, 449, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969) (church property); Gonzalez v. Roman Catholic Archbishop of Manila, 280 U.S. 1, 16, 50 S.Ct. 5, 74 L.Ed. 131 (1929) (appointment of clergy).

.- In this way, Center for Inquiry may be distinguished as an outlier example of organized secular belief systems gaining protected treatment. The District Court correctly noted that "the majority of precedent continues to support preferential treatment for religion under the law, without explicitly extending that treatment to iftclude secular beliefs,” J.A. 36.

. In its brief, Real Alternatives relies on a number of dictionary definitions to suggest, contrary to statutory and regulatory definitions, that the modes of contraceptives covered by the Contraceptive Mandate are capable of inducing abortion.

. See also J.A. 51 (noting Representative Weldon’s statement when proposing the eponymous amendment: "The provision of con- . traceptive services has never been defined as abortion in Federal statute, nor has emergency contraception, what has commonly been interpreted as the morning-after pill. Now, some religious groups may interpret that as abortion, but we make no reference in this statute to religious groups or their definitions; and under the current FDA policy that is considered contraception, and it is not affected at all by this statute.”).

. The Church Amendment claim was brought only by the Real Alternatives Employees because the Church Amendment applies only to individuals.

. Echoing the District Court, we state what we consider to be obvious: Hobby Lobby did not answer the RFRA question we confront today. In Hobby Lobby, the Supreme Court found that an employer’s provision, not an individual’s maintenance, of coverage may violate RFRA. 134 S.Ct. at 2778. As they did before the District Court, the Real Alternatives Employees ignore this important distinction and attempt to stretch the holding of Hobby Lobby well beyond its factual confines. The Dissent similarly misstates the applicability of Hobby Lobby, characterizing the issue there as "very like the one at issue here.” Dissent Op. at 372.

. Although our judgment in Geneva was vacated by the Supreme Court, it nonetheless sets forth the view of our Court, which was based on Supreme Court precedent, that we continue to believe to be correct regarding our duty to assess substantiality as well as our conclusion that the regulation at issue there did not impose a substantial burden. Cf. Zubik, 136 S.Ct. at 1560 (specifying that vacatur and remand do not express the Supreme Court’s "view on the merits” of Geneva). That ’ judgment, and others cited here that addressed similar claims, was vacated because the Supreme Court wanted the parties to attempt—after the parties signaled they might be able—to develop a way for existing or modified ACA regulations to provide continued contraceptive coverage to petitioners' employees and through petitioners’ insurers without any notice from petitioners. Id. Thus, Zubik vacated our judgment in Geneva but did not attack our reasoning. The Dissent mis-characterizes our holding today to b.e saying that Geneva is "controlling" for purposes of this case, Dissent Op. at 373-74, That is not our position. While Geneva is no. longer controlling, there is nothing thaj would require us—or anyone else—to conclude that our reasoning in that opinion was incorrect.

. See. also Matthew Á. Melone, Corporations and Religious Freedom: Hobby Lobby Stores—A Missed Opportunity to Reconcile a Flawed Law with a Flawed Health Care System, 48 Ind. L. Rev. 461, 502-03 (2015) (“[T]he lack of any principled limitation on the' meaning of religious exercise should prompt the courts to examine whether any burden on such exercise is substantial. Otherwise, RFRA becomes anarchical.... The notion that the judiciary has no business questioning the substantiality of a burden in this context is illogical. The law imposes objective standards on beliefs in other contexts and appears to do so without inordinate difficulty:... Every’person has the right to attach whatever religious meaning to act to an act their conscience demands. The law, however, should not be hostage to the vagaries of the - hypersensitive.”) (footnotes omitted).

. For a persuasive discussion of the untenable consequences of the Real Alternatives Employees' and Dissent’s theory of absolute deference to an allegation that a burden is substantial, see Brief of Baptist Joint Corn-mittee for Religious Liberty as Amicus Curiae in Support of Respondents 14-16, Zubik v. Burwell, 136 S.Ct. 1557 (2016) (Nos. 14-1418, 14-1453, 14-1505, 15-35, 15-105, 15-119, 15-191).

.The Dissent grounds its aversion to judicial review of substantiality in a Tenth Circuit dissent from the denial of en banc'review in the Little Sisters cáse, and points to James Madison’s critique of the "notion that a civil judge can be a competent Judge of Religious Truth” for support. Dissent Op. at 384 (internal quotation marks omitted). Madison’s writings are indeed instructive, as our refusal today to permit a claimant’s bare allegations to automatically render a burden "substantial” is embedded in Madison’s Federalist No. 10: "No man is allowed to be a judge in his own cause, because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity. With equal, nay with greater reason, a body of men, are unfit to be both judges and parties at the same time.” The Federalist No. 10, 59 (James Madison).

. See Bowen, 476 U.S. at 700-01 n.6, 106 S.Ct. 2147 ("[F]or the adjudication, of a constitutional claim, the Constitution, rather than an individual’s religion, must supply the frame of reference.”).

. See Little Sisters, 794 F.3d at 1176-77 ("RFRA’s statutory text and religious liberty case law demonstrate that courts—not plaintiffs—must determine if a law or policy substantially burdens religious exercise” and finding alleged burden not “substantial.”) (emphasis added); Priests for Life v. U.S. Dep’t of Health & Human Servs., 772 F.3d 229, 247 (D.C. Cir. 2014) ("Accepting the sincerity of plaintiffs’ beliefs, however, does not relieve this Court of its responsibility to evaluate the substantiality of any burden on plaintiffs’ religious exercise....”), vacated and remanded sub nom. Zubik, 136 S.Ct. at 1561; E. Tex. Baptist Univ. v. Burwell, 793 F.3d 449, 456 (5th Cir. 2015) ("We begin and end our analysis with the substantial-burden prong. The plaintiffs must show that the challenged regulations substantially burden their religious exercise. ...”), vacated and remanded sub nom. Zubik, 136 S.Ct. at 1561; Korte v. Sebelius, 735 F.3d 654, 683 (7th Cir. 2013) (characterizing impermissible questions about the "centrality of the religious practice to the adherent's faith” as distinct from the substantial burden inquiry, which "evaluates the coercive effect of the governmental pressure on the adherent’s religious practice and steers well clear of deciding religious questions”); Navajo Nation v. U.S. Forest Serv., 535 F.3d 1058, 1068 (9th Cir. 2008) (en banc) (characterizing the "crux” of the RFRA case as determining whether the Government “impose[d] a 'substantial burden’ on the exercise of the Plaintiffs' religion” and finding no substantial burden where Government sought to use artificial snow for skiing on a mountain sacred to Indian tribe claimant); Branch Ministries v. Rossotti, 211 F.3d 137, 142-43 (D.C. Cir. 2000) (directly assessing whether claimant's alleged religious burden was sufficiently substantial under RFRA and finding that it was not); see generally infra note 37. But see Sharpe Holdings, Inc. v. U.S. Dep't of Health & Human Servs., 801 F.3d 927, 939 (8th Cir. 2015) ("[0]ur narrow function ... in [the RFRA] context ... is to determine whether the line drawn reflects an honest conviction.” (internal quotation marks omitted) (alteration and omission in original)), vacated and remanded on other grounds sub nom. U.S. Dep’t of Health & Human Servs. v. CNS Int’l Ministries, — U.S. -, 136 S.Ct. 2006, 195 L.Ed.2d 210 (2016).

.Urging that we are wrongly questioning the "validity,” Dissent Op. at 370, and "legitimacy,” id. at 373, of the Real Alternatives Employees’ religious beliefs, the Dissent conflates our dual responsibilities in adjudicating a RFRA claim; accepting the sincerity of a RFRA claimant's religious belief and deciding whether the alleged burden is "substantial.” See Hobby Lobby, 134 S.Ct. at 2778 (noting that the RFRA presents the question of "whether the [Contraceptive Mandate] imposes a substantial burden” on the claimant, and not “whether the religious belief asserted ... is reasonable"); Little Sisters, 794 F.3d at 1176 ("[Accepting any burden alleged by Plaintiffs as 'substantial’ would improperly conflate the determination that a religious belief is sincerely held with the determination that a law or policy substantially burdens religious exercise.”).

. One could analogize that a bank does not "exist independently” of its individual ac-countholders, whose money the bank lends at interest in order to earn profit, But the ac-countholders have no say in lending decisions (what rates to charge, which borrowers to lend to) and no direct control over the bank. They, like a subscriber to an insurance plan, are offered a panoply of services that' are predeterminately attached-to. whichever account (or plan) they choose. Some are desirable to the accountholder and some are not. Assume that the individual’s bank account is mandated by the Government under a privatized Social Security regime, for example. If an accountholder had a religious objection to the bank's practices—lending money at interest—we do not see how that accountholder could successfully vindicate his or her religious beliefs through RFRA. So too in the context of health insurance, every participant pays a premium so that the health insurer will provide coverage, and every participant also receives (some of) the benefits of that.coverage as they so choose. But paying a premium simply is not equivalent to active participation—at a minimum, the insured employee has no say in what benefits the insurance company will offer or to whom—and "playing a role,” however important to the plan’s existence, does not automatically translate into experiencing a burden, let alone a substantial one.

. While the Dissent urges that whether a burden is direct or indirect is no matter, even March for Life intimated otherwise. Adopting Priests for Life, the District Court in March for Life stated that "it is true that [a]n asserted burden is also not an actionable substantial burden when it falls on a third party, not the religious adherent." 128 F.Supp.3d at 129 (alteration in original). It then reasoned: "Even though the plaintiffs are not the direct objects of the Mandate, they are [ ] very much burdened by it." Id. By its own logic, March for Life acknowledged that directness matters in assessing whether there is an "actionable substantial burden,” but then found a different means (by erroneously focusing on participation) of concluding that plaintiffs were nonetheless “very much burdened."

. See also Elizabeth Sepper, Substantiating the Burdens of Compliance, 2016 U, III. L. Rev. Online 53, 68 (noting that courts in multiple areas of law, including criminal law and torts, "evaluate[] burdens along a.scale between directness and attenuation").

. This point is particularly relevant in light of the Real Alternatives Employees’ allegation that the Contraceptive Mandate "fundamentally chang[es] the compensation package that can be offered to the individual employees." J.A. 123. That change, fundamental or not, still does not alter the nature of the conduct that the employees engage in when signing up for, or súbmitting a claim for reimbursement under, an insurance plan.

.The Dissent criticizes our consideration of how directly the burden affects the religious exercise and highlights the Supreme Court’s statement in Lyng that “indirect coercion or penalties on the free exercise of religion, not just outright prohibitions, are subject to scrutiny under the First Amendment.” Dissent Op. at 377 (citing 485 U.S. at 450, 108 S.Ct. 1319). But the Dissept ignores the remainder of that paragraph, which specifically warns against implying. from that observation that "incidental effects of government programs, which may make it more difficult to practice certain religions , but which have no tendency to coprce individuals into acting contrary to their religious beliefs, require [Gjovernment . to bring forward a compelling justification for its otherwise lawful actions,!’ 485 U.S. at 450-51, 108 S.Ct. 1319. Subsequent appellate courts applying Lyng have heeded that advice. Cf. Klem, 497 F,3d at 279 (Lyng did not "hold that its conclusion must be read to mean that *362 any incidental effect of a government program which may have some tendency to coerce individuals into acting contrary to their religious beliefs satisfies the substantial burden standard.”).
The Dissent further aims to supplement its mistaken view of "substantial burden” by couching it in the context of the recent Supreme Court case Trinity Lutheran Church of Columbia, Inc. v. Comer, —— U.S. -, 137 S.Ct. 2012, 198 L.Ed.2d 551 (2017), pointing to that decision as demonstrative of the idea that "laws that coerce religious claimants to disavow their religion in order to receive a government benefit!] are inconsistent with our constitutional traditions.” Dissent Op. at 380. But Trinity Lutheran has no real bearing on the specific question before us today. As our dissenting colleague implicitly recognizes, Trinity Lutheran is not a RFRA case. It dealt with a church’s constitutional challenge to a state program that automatically denied grants to any applicant owned or controlled by a religious entity. 137 S.Ct. at 2017. "[T]he [state program’s] policy put[ ] Trinity Lutheran to a choice: It may participate in an otherwise available benefit program or remain a religious institution.” Id. at 2021-22. The question before the Supreme Court addressed only the treatment of an institution based on its religious status, not the effect of a federal program on individual religious beliefs. Signaling its intent to confine its holding to the particular facts and issue before it, the opinion noted: "This case involves express discrimination based on religious identity with respect to playground resurfacing. We do not address religious uses of funding or other forms of discrimination.” Id. at 2024 n.3,

. By contrast, ”[t]he religious costs at issue in Hobby Lobby were generated by the owners’ direct participation in the purportedly wrong act—arranging and paying for the coverage of emergency contraception that they knew would be used by at least some employees and beneficiaries of their health plan. While one might have argued, as Justice Ginsburg did, that the independent decisions of employees and beneficiaries to use contraception were something like ‘intervening causes’ which cut off the owners' responsibility, it is also reasonable to conclude that those third-party decisions are insufficient to terminate responsibility when owners’ themselves are required to arrange and (partially) pay for coverage of the objectionable contraceptives.” Frederick Mark Gedicks, ‘‘Substantial" Burdens: How Courts May (and Why They Must) Judge Burdens on Religion Under RFRA, 85 Geo. Wash, L. Rev. 94, 147 (2017) (footnotes omitted) (first emphasis added); see also Geneva, 778 F.3d at 436-37 ("The issue of whether there is an actual burden was easily resolved in Hobby Lobby, since there was little doubt that the actual provision of services did not render the plaintiffs ‘complicit.’ And in Hobby Lobby, the Court came to its conclusion that, without any accommodation, the contraceptive coverage requirement imposed a substantial burden on the religious exercise of the for-profit corporations, because those plaintiffs were required to either provide health insurance that included contraceptive coverage, in violation of their religious beliefs, or pay substantial fines.”) (final emphasis added). The contrast with this case, which the Dissent fails to reconcile, is abundantly clear: Whereas an employer fashioning a plan for employees and offering it to them might arguably signal approval of that plan and its contents, the employee’s act of signing up for a pre-defined health insurance plan that provides reimbursement for services that include contraceptive services does not.

. 42 U.S.C. § 2000bb-l ("Government shall not substantially burden a person’s exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.”) (emphasis added).

. S. Rep. 103-111, 9 (1993) ("The act thus would not require such a justification for every government action that may have some incidental effect on religious institutions.”).

. Other courts have come to similar conclusions in various contexts. Newdow v. Peterson, 753 F.3d 105, 109-10 (2d Cir. 2014) (holding that a currency’s slogan did not substantially burden the plaintiff’s free exercise rights); United States v. Friday, 525 F.3d 938, 947 (10th Cir. 2008) (holding that requiring some to receive a permit before engaging in a religiously mandated activity did not substantially burden their free exercise rights); Henderson v. Kennedy, 253 F.3d 12, 17 (D.C. Cir. 2001) (holding that a law did not substantially burden people’s free exercise rights by preventing them from distributing religious shirts on the National Mall because they “can still distribute t-shirts for free on the Mall, or sell them on streets surrounding the Mall”); Goodall by Goodall v. Stafford Cty. Sch. Bd., 60 F.3d 168, 172-73 (4th Cir. 1995) ("We find that the financial burden which the [RFRA claimants] must bear in order to provide [their son] with a cued speech interpreter at his private sectarian school does not constitute a substantial burden under RFRA.”); Smith by Smith v. Bd. of Educ., 844 F.2d 90, 94 (2d Cir. 1988) (holding that a school did not substantially burden a student’s free exercise rights by holding graduation on the Sabbath); Azeez v. Fairman, 795 F.2d 1296, 1300 (7th Cir. 1986) (holding that an administrative name change procedure did not substantially burden a prisoner’s free exercise rights); Friedman v. Bd. of Cty. Comm’rs, 781 F.2d 777, 791 (10th Cir. 1985) (holding that a county seal did not substantially burden the plaintiff's free exercise of religion); Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc., v. City of Lakewood, 699 F.2d 303, 307- *364 08 (6th Cir. 1983) (finding that a local ordinance did not substantially burden a church’s free exercise rights by preventing the church from constructing a new church in just ten percent of a; city); Walsh v. Louisiana High Sch. Athletic Ass’n, 616 F.2d 152, 158 (5th Cir. 1980) (finding that-an interscholastic athletic rule did not substantially burden the plaintiff's free exercise rights by preventing him from competing in interscholastic high school sports for a year after a transfer); Berman v. Bd. of Elections, 420 F.2d 684, 686 (2d Cir. 1969) (holding, in .the alternative, that the Government did not substantially burden a voter’s free exercise rights when it accommodated his religious opposition to voting in a church by allowing him to change voting districts and vote by absentee ballot).

. ' Gonzales, the only other case that the Dissent cites'to address workability, said nothing about our concerns regarding die end-run on legislation that a ruling in favor of the Real Alternatives Employees would unleash. See Dissent Op. at 381 (citing Gonzales, 546 U.S. at 436, 126 S.Ct. 1211).

. The Dissent would prefer that “we leave to the insurance companies themselves the decision of what coverage options they can profitably provide.” Dissent Op. at 383. By the Dissent’s logic, any regulation of any market is unnecessary because sellers in any market presumably have some interest in keeping that market functioning. Why require car .manufacturers to provide seatbelts if market demands will necessitate them anyway? It is entirely within the legislature’s prerogative to regulate an industry regardless of whether that industry may otherwise and on its own ■impose similar regulations.

.The existence of an alternative plan is only relevant to standing and questions of redress-ability,

. We note that the Dissent’s assertion that '‘[t]ime and again courts have rejected the regulation because it is not the least restrictive means of achieving its objective,” Dissent Op. at 368, is simply wrong, for only one case in addition to March for Life has addressed the precise question before us today. That case, Wieland v. United States Department of Health and Human Services, 196 F.Supp.3d 1010 (E.D. Mo. 2016), essentially adopted the reasoning of March for Life in finding for the RFRA claimants and did not perform a meaningfully distinct analysis.