<u>IN THE COMMONWEALTH COURT OF PENNSYLVANIA</u>

| | | |
|---|---|---|
| Mohamad Alsyrawan, | : | |
| Petitioner | : | |
| | : | |
| v. | : | |
| | : | |
| Department of Human Services, | : | No. 111 C.D. 2023 |
| Respondent | : | Argued: April 11, 2024 |


BEFORE:    HONORABLE ANNE E. COVEY, Judge
                HONORABLE CHRISTINE FIZZANO CANNON, Judge
                HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION BY
JUDGE COVEY                            FILED:  May 20, 2024

       Mohamad Alsyrawan (Petitioner) petitions this Court for review of then Acting Secretary of Human Services, Meg Snead's (Secretary Snead),[1] January 9, 2023 Final Order affirming the Department of Human Services' (Department), Bureau of Hearings and Appeals' (BHA), November 3, 2022 decision that adopted the Administrative Law Judge's (ALJ) adjudication denying Petitioner's request for an exception to the Department's cap on the number of in-home care hours his family members may provide to him.  Petitioner presents two issues for this Court's review: (1) whether the Department's refusal to grant Petitioner an exception infringes upon his right to exercise his religion under the Free Exercise Clause in the First Amendment to the United States (U.S.) Constitution (First Amendment);[2] and (2) whether the Department's refusal to grant Petitioner an exception violates the Religious Freedom Protection Act (RFPA).[3]  After review, this Court affirms.

---

[1] Valerie A. Arkoosh, M.D., MPH was appointed Secretary on January 17, 2023.

[2] U.S. CONST. amend. I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]").

[3] Act of December 9, 2002, P.L. 1701, 71 P.S. §§ 2401-2408.

## Background

The Pennsylvania Supreme Court has explained:

Medicaid is the nation's primary health insurance program for low-income and high-need Americans. Enacted in 1965 and set forth at Title XIX of the Social Security Act, [] 42 U.S.C. §§ 1396-1396w-6, Medicaid is jointly funded by the federal and state governments. Although a state's participation in Medicaid is optional, once a state elects to participate[,] it must comply with Title XIX and applicable regulations. Medicaid is administered at the federal level by the Centers for Medicare & Medicaid Services ([]CMS[]), an agency of the [U.S.] Department of Health and Human Services. In Pennsylvania, it is administered by [the Department] and is known as Medical Assistance.

For states that participate in Medicaid, the federal government requires coverage for certain mandatory populations and services, but it also authorizes waiver programs, or simply "waivers" for short, which give states flexibility to operate outside [the] federal rules.

One category of waivers, authorized by Section 1915(c) of the Social Security Act, 42 U.S.C. § 1396n, falls under the umbrella term Home and Community Based Services ([]HCBS[]). These waivers allow states to meet the needs of eligible individuals receiving long-term care supports and services in their home or community rather than in an institutional setting . . . .

Within [the Department], the Office of Developmental Programs ([]DHS/ODP[]) . . . is responsible to fund and supervise the provision of services associated with HCBS waivers, most notably . . . , community participation support ([]CPS[]) services. . . .

In Pennsylvania, CPS services are provided pursuant to three HCBS waivers: the Consolidated Waiver, the Person/Family Directed Support Waiver, and the Community Living Waiver. The CPS services themselves are supplied by vendors, or providers, who in turn are

2

> reimbursed by DHS/ODP pursuant to rates developed and published by [the Department].[4]

*Rehab. & Cmty. Providers Ass'n v. Dep't of Hum. Servs. Off. of Developmental Programs*, 283 A.3d 260, 262-63 (Pa. 2022); *see also Bussoletti v. Dep't of Pub. Welfare*, 59 A.3d 682 (Pa. Cmwlth. 2012).

Relatives or legal guardians of adult individuals with intellectual disabilities may be paid to provide HCBS and Companion services authorized by a recipient's individual support plan (ISP) when such services are considered extraordinary care (i.e., they exceed what is expected in the usual course of parenting), the services would otherwise have to be provided by a qualified service provider funded under the Consolidated Waiver, and the legally responsible person meets the ODP's qualification criteria. *See* Certified Record (C.R.) Item 4, Final Administrative Action Order Finding of Fact (FOF) 3; *see also id*. at 12-13 (C.R. at 206-207).

On June 30, 2016, ODP applied to CMS for a waiver to, *inter alia*, "[i]mplement a limit on the amount of [HCBS] and/or [C]ompanion services that can be provided by relatives and legal guardians." C.R. at 76. ODP proposed to limit the maximum hours a relative or legal guardian may be paid to provide HCBS and Companion services to a Consolidated Waiver participant to 40 hours for a single caretaker and 60 hours for multiple caretakers (40/60 Rule or family cap). *See* C.R. at 78. CMS approved the change on July 13, 2016, to be effective as of February 1, 2017. *See* C.R. at 75, 102, 108.

On September 16, 2016, the ODP issued ISP Manual Bulletin No. 00-16-06 (ODP Bulletin), Section 14 of which declared, in pertinent part:

---

[4] "Waiver services complement and/or supplement the services that are available to participants through the Medicaid [s]tate plan and other federal, state[,] and local public programs[,] as well as the supports that families and communities provide." *See* Certified Record at 75.

3

[A]ny one relative or legal guardian may provide a maximum of 40 hours per week of authorized [HCBS and Companion services]. Further, when multiple relatives and/or legal guardians provide the service(s)[,] **each individual may receive no more than 60 hours per week . . . from all relatives** and legal guardians[].

An exception [to the 40/60 Rule] may be made . . . when there is an emergency or an unplanned departure of a regularly scheduled worker for up to 90 calendar days in any fiscal year.

C.R. Item 3, Ex. C-5 (ODP Bulletin) at 137-138 (C.R. at 86-87) (emphasis added; footnote omitted).

Section 14 of the ODP Bulletin clarified:

In general, these situations include, but are not necessarily limited to:

• Unexpected circumstances such as inclement weather, sudden illness, or the unplanned extension of medical leave, that prevent a regularly scheduled worker from arriving at the job site and where another worker/caregiver is not immediately available to work;

• Situations where a regularly scheduled worker is terminated or refuses to provide care without providing adequate notice (e.g.[,] the worker notifies the employer that he or she refuses to work on the day he or she is scheduled to provide the service or is dismissed due to gross non-compliance or misconduct); or

• The sudden loss of a caregiver who provided uncompensated support that kept the provision of services by relatives at or below 40/60 hours per week.

4

ODP Bulletin at 138 (C.R. at 87); *see also* FOFs 4-5, 8 (C.R. at 200). However, "[t]here are no permanent exceptions to the 40[/]60 Rule."[5] FOF 7 (C.R. at 200).

Petitioner and his family emigrated from Syria to the U.S. in 2001 and are Muslim. Petitioner is a non-verbal adult male[6] with intellectual disabilities who resides at home with his mother (Mother) in Philadelphia. Petitioner has been diagnosed with, *inter alia*, Down syndrome, autism, mental intellectual disabilities, a hearing problem, and sleep apnea. Petitioner requires constant supervision and assistance with all activities of daily living and doctor's appointments,[7] plus in-home activities and outside activities Petitioner enjoys, such as dining, swimming, and walking. Mother and Petitioner 's sister (Sister) are currently Petitioner's primary caretakers.[8] *See* FOF 11; *see* C.R. at 202, 508-509.

In July 2016, based on his ISP, the Department approved Petitioner to receive 133 hours per week (i.e., 19 hours per day) of HCBS in addition to Companion services under the Department's Consolidated Waiver. *See* FOF 9 (C.R. at 200). The Department also authorized Petitioner to attend a day program at The Center for Creative Works (Center), Monday through Friday, from 8:30 a.m. to 2:30 p.m., which he regularly attended from November 15, 2016 until February 10, 2020, when the COVID-19 pandemic began.[9] *See* C.R. at 36, 57, 114, 425-426, 506.

---

[5] *But see Jalil v. Dep't of Hum. Servs.* (Pa. Cmwlth. No. 1856 C.D. 2019, filed Feb. 22, 2021). This Court's unreported memorandum opinions may be cited "for [their] persuasive value, but not as binding precedent." Section 414(a) of the Commonwealth Court's Internal Operating Procedures, 210 Pa.Code § 69.414(a). *Jalil* is cited for its persuasive value.

[6] Petitioner communicates primarily through gestures, facial expressions, and lip reading. *See* C.R. at 502-504.

[7] Aside from needing assistance with daily personal care, Mother described that Petitioner must be carefully monitored because he can move quickly and quietly, and will try to go outside alone, plus he has an affinity for fire and will leave the stove on or put metal silverware in the microwave. *See* C.R. at 509, 530.

[8] Petitioner's brother lives in Florida. Petitioner's father lives in Syria and has never been a part of his life. *See* C.R. at 518-519.

[9] Due to transportation difficulties, Petitioner went to the Center only approximately 60% of the approved time. *See* C.R. at 203.

5

Under the Consolidated Waiver, MARSCare[10] pays Mother for the daily care she provides Petitioner from 6:00 a.m. to 5:00 p.m. (when Petitioner does not attend a day program), and pays Sister for care she provides Petitioner from 10:00 p.m. to 6:00 a.m.[11] *See* FOFs 11-12 (C.R. at 200); *see also* C.R. at 505-506, 508-510. Prior to the Department's implementation of the 40/60 Rule, Mother and Sister were paid for providing more than 60 hours of Petitioner's care each week.[12] *See* FOF 10.

**Facts**

On January 10, 2017, after being made aware of the 40/60 Rule, Mother filed an agency appeal on Petitioner's behalf seeking a permanent exception under which Mother and Sister would be permitted to continue providing Petitioner more than 60 hours of his paid weekly care "because Mother . . . wants to keep [Petitioner] under her care and provide and serve his needs for religious purposes and other issues that can affect [him] mentally and emotionally." C.R. at 91. By January 13, 2017 letter, the Department notified Petitioner that his request had been forwarded to the BHA. ALJ Clarissa M. Edu (ALJ Edu) conducted a hearing on February 21, 2017. On March 27, 2017, ALJ Edu dismissed Petitioner's appeal for lack of jurisdiction because it was not based on a Department denial, suspension, or discontinuance of benefits but rather a non-appealable change to a CMS-approved waiver. *See* FOF 17; *see also* C.R. at 99-109. On March 29, 2017, the BHA affirmed ALJ Edu's adjudication. *See* C.R. at 98. On April 17, 2017, Petitioner petitioned

---

[10] MARSCare is the provider contractually matched with Petitioner to provide his Consolidated Waiver services. *See* FOF 12 (C.R. at 200).

[11] Mother provides Petitioner's care from 5:00 p.m. to 10:00 p.m. without pay. Mother goes to bed around 11:00 p.m. and wakes up for prayer at approximately 5:45 a.m. Sister is employed by Children's Hospital during the week from 8:30 a.m. to 4:30 p.m. Thereafter, she sleeps until she must travel to Mother's home to care for Petitioner. Sister lives with a roommate approximately 20 minutes away.

[12] On days that Petitioner was at the Center, Mother was paid for fewer HCBS hours. *See* C.R. at 186.

the Department's then-Secretary Ted Dallas (Secretary Dallas) to remand the matter to the BHA. *See* FOF 18; *see also* C.R. at 111, 114. On July 10, 2017, Secretary Dallas denied Petitioner's request and upheld the BHA's March 29, 2017 decision. *See* FOF 19; *see also* C.R. at 114. Petitioner appealed to this Court. *See* FOF 20.

By October 4, 2017 letter, MARSCare notified Petitioner of its intent to enforce the 40/60 Rule. *See* FOF 21. On November 22, 2017, this Court remanded the matter to the BHA. *See* FOF 22. On February 12, 2018, the BHA conducted a hearing at which the parties entered into a Stipulation of Settlement, therein agreeing to have the Department re-assess Petitioner's eligibility for an exception to the 40/60 Rule. *See* FOF 23; *see also* C.R. at 111. On April 25, 2018, after re-assessing Petitioner's circumstances, the Department denied Petitioner's exception request, stating:

> Based on our review of this information and the discussions with his day staff, our conclusion is that [Petitioner] responds to both male and female staff and there is no reason to limit staff support at his home to his [M]other and [S]ister. Therefore, the request for an exception to the 40/60 [Rule] established in the Consolidated Waiver is not granted. Family preferences in terms of gender should be honored by the provider agency.

C.R. at 115; *see also* FOF 24; *see also* C.R. at 113-114, 116. On April 26, 2018, Petitioner appealed to the BHA. *See* FOF 25.

Before the BHA scheduled a hearing,[13] the global COVID-19 pandemic ensued in March 2020. *See* FOF 26. Due to the public health emergency created by

---

[13] [A] fair hearing was not scheduled for an extended period of time[,] which included the first 18 months of the [COVID-19] pandemic. In September 2021, after discovery of this oversight, the Philadelphia Department of Behavioral Health and [D]is[a]bility Services, acting as the Philadelphia Administrative Entity for

the pandemic, the Department issued a temporary exception/suspension to the 40/60 Rule, commonly referred to as Appendix K, that allowed relatives to be paid for caring for participants in excess of the 60-hour family cap each week. *See* FOFs 27-28. Pursuant to Appendix K and with the Department's approval for the pendency of this appeal, Mother and Sister continue to be paid for Petitioner's care above the 60-hour per week cap.[14] *See* FOFs 29, 32.

ALJ Nadiola Logan-Thomas (ALJ Logan-Thomas) conducted hearings on November 18, 2021, and May 3, July 19, and September 13, 2022. *See* C.R. at 233-582. At the hearings, Mother testified that she was seeking a permanent 40/60 Rule exception for religious reasons. *See* C.R. at 512. She described that her family, including Petitioner, follows Islamic law set forth in the Quran, which forbids, *inter alia*, unrelated males and females from being alone together, and unrelated males from providing personal care involving nudity or exposed private areas. *See* C.R. at 512-513, 516. Therefore, to protect Petitioner from sin, only Mother, Sister, or other closely related female relatives may be alone with Petitioner, and only a father, brother, uncle, or grandfather could provide his more intimate bathroom and shower care. *See* C.R. at 513-516, 526. Mother added that the prohibition of unrelated males and females being alone together likewise prohibits her from being alone with an unrelated male caretaker while he is tending to Petitioner. *See* C.R. at 538-539, 543-544. She explained that exceptions to the Islamic privacy mandates are only made

---

[ODP], asked [Petitioner] to complete additional paperwork for a fair hearing request, which he did. [*See*] C[.]R[. at] 10-16.

Petitioner Br. at 6.

[14] In the interim, in *Jalil*, this Court observed that the Department had "granted . . . an exception to the 40/60 Rule; however, no evidence was presented which established the type of exception granted or the reasons for the exception." Slip op. at 10 (C.R. at 151). The parties to the instant matter stipulated that the exception in *Jalil* that the Department granted was "based on individualized circumstances and not based on an emergency or unplanned departure of a regularly scheduled worker." C.R. at 182; *see also* C.R. at 563-564.

when necessary for survival (i.e., if Mother dies or is unable to care for Petitioner), and since she can now care for and protect Petitioner, she must do so in accordance with Islamic law. *See* C.R. at 540, 550.

Mother also expressed that her request for a permanent 40/60 Rule exception is based on her concern for Petitioner's safety, since Petitioner is non-verbal and "cannot express himself if something happened to him." C.R. at 515. Although she claims to generally trust people, she has witnessed how staff has made disabled people angry and calmed them with medication instead of love and care, and she must do what is best for Petitioner to keep him safe. *See* C.R. at 527-529. Mother admitted that she trusted the public school staff and the Center's staff, including Center program specialist Jason Johnson (Johnson), because they respected her rules, Petitioner was usually in an open area in a group setting, and those institutions were responsible for keeping Petitioner safe while he was there. *See* C.R. at 529-532.

Mother admitted that, in the absence of the requested exception, she will not allow an unrelated caregiver to provide care during the other hours; she and Sister would continue to solely provide his care to keep him safe and protect him from sin. *See* C.R. at 516-517, 521, 534. Mother stated that even if she allowed an unrelated male Islamic caregiver into her home, she could not be in the home with the caregiver because her father, husband, or other son are not present. *See* C.R. at 537-539. She acknowledged that she could provide Petitioner's more intimate care before and after a male caregiver's time with Petitioner, and the caregiver would not have to be of the Islamic faith, but added that an Islamic caregiver would understand that Petitioner must pray five times per day,[15] pray in a certain place, and wash before

---

[15] Mother prays daily at 6:00 a.m., 1:00 p.m., 5:00 p.m., 7:00 p.m., and 9:00 p.m. *See* C.R. at 542-543.

9

praying - all of which Petitioner must be prompted to do. *See* C.R. at 537-538, 541-542.

Mother explained that she primarily speaks to Petitioner in her native language, Arabic. *See* C.R. at 504, 516. Mother declared that Petitioner understands English, but "he understand[s] Arabic more." C.R. at 504. Mother believes Petitioner would function best with a caregiver who speaks Arabic. *See* C.R. at 516. However, Petitioner's ISP reflects that "his family speaks English and Arabic. He understands more English than Arabic." C.R. at 41. Moreover, Mother acknowledged that Petitioner attended the Philadelphia public school system and an after-school program without an aide until he graduated in June 2016. *See* C.R. at 522. She claims that Petitioner received his high school education in English and Arabic, because her friend who worked in the schools translated for him. *See* C.R. at 522-524.

Mother detailed the daily care Petitioner requires and declared that he must constantly be supervised. *See* C.R. at 509, 530. She specified that he needs support when he bathes - prompts to wash, and stabilizing to get in and out of the shower. *See* C.R. at 507-508. Mother added that Petitioner also needs bathroom assistance. *See* C.R. at 508, 510. She explained:

> Q. Would it create a problem for [Petitioner's] care for there to be an aid who is outside the bathroom that does not assist him inside the bathroom?
>
> A. Yeah, because he is supposed to wash him, and [Petitioner] would be nervous. He like [sic] to be clean. Like, what if he - for example. Sorry about this. People who have to wash him. He [sic] going to call me from my side, come wash your son. It's going to be so complicated, you know?
>
> Q. So, when he has a bowel movement, does [Petitioner] need to be washed?

A. Yes, he needs to be washed, and he would be nervous if we don't do it for him.

Q. What happens when [Petitioner] is nervous?

A. He don't [sic] move from his seat until you do it for him. If you force him to pull up his pants, he gets nervous. His face gets red. You find him all around the house trying to open the door and leave the house. That's a way when he be [sic] nervous, he be - then he picking. My son picking on his forehead and then he bleed. He picks at his forehead.

C.R. at 544. Mother acknowledged that Petitioner used the bathroom at the Center without such assistance (rather, male staff at the Center prompted Petitioner from outside the bathroom), but claimed that she regularly received calls from Center staff for her to go and change Petitioner or provide clean clothing because he was soiled or wet, or he refused to leave the bathroom. *See* C.R. at 510, 533, 536-537.

Mother explained that Petitioner loved attending the Center's program, but he did not return when it reopened after the pandemic because staff informed her that only the program for higher functioning adults reopened, that Petitioner was not suited for it, and that the Center would contact her if his particular program reopened. *See* C.R. at 510-512.

Johnson testified that Petitioner was a joy to have at the Center, that he liked interacting with the other participants and staff once he got to know them, and that he loved creating art, especially drawing. *See* C.R. at 428-430. He expressed that, although being non-verbal presented a challenge initially, Petitioner was very expressive with his face and the staff worked with Mother to know what Petitioner liked and did not like. *See* C.R. at 426-428, 430. Johnson recalled that Mother raised Petitioner's religion relative to foods and certain events that Petitioner could not participate in, but not related to Center staff. *See* C.R. at 434-435. He stated that

11

male and female staff worked with Petitioner in group settings at the Center. *See* C.R. at 426-430.

Johnson described that the Center generally afforded its participants as much autonomy as possible, particularly relative to the bathroom. *See* C.R. at 432. However, he recalled that Mother declared her preference for Petitioner to use the single-stall bathroom at the Center. *See* C.R. at 432. He also testified that, after Mother expressed concerns with Petitioner's sanitation in restrooms, he and other Center staff watched for when Petitioner went to the bathroom and then prompted him from outside the bathroom to wipe and wash his hands. *See* C.R. at 431-433. Johnson related that, based on his observations, Petitioner was able to independently toilet and wash up thereafter. *See* C.R. at 431. Johnson did not specifically recollect Petitioner urinating on himself or Center staff calling Mother about changing Petitioner's clothes,[16] but he remembered discussing with Mother having to prompt Petitioner to exit the bathroom after 15 minutes or more. *See* C.R. at 440-441.

Johnson confirmed that the Center still offers a program for which Petitioner would qualify under the Consolidated Waiver, but that program (i.e., 2390) is more focused on employment and is not as suitable for Petitioner as the discontinued program (i.e., 2380). *See* C.R. at 437-440.

Based on the record, on October 28, 2022, ALJ Logan-Thomas denied Petitioner's appeal, concluding that the Department properly refused to grant an exception to the 40/60 Rule because there is care available to Petitioner that would not violate the family's religious rules and safety concerns. Specifically, the evidence established: (1) Mother prefers for her and Sister to provide all of Petitioner's care for religious and safety reasons; (2) a male caregiver could attend to Petitioner (except for dressing, bathing, and bathroom care) while Mother is out

---

[16] Johnson testified that if that did occur, it did not occur frequently. *See* C.R. at 441.

12

of the house without violating Islamic law; (3) Mother has not explored whether Petitioner would now benefit from the Center's 2390 program, or whether another day program is acceptable for him; (4) Petitioner does not require an Arabic-speaking caretaker because, during the years that he attended public school, the after-school program, and the Center, English-speaking staff effectively communicated with him; (5) Petitioner does not require washing after every bowel movement because he attended school and the Center where he cleaned himself with verbal prompts; and (6) Mother's and Sister's care schedules are demanding, and lack of rest on their part could negatively affect the quality of service they provide for Petitioner. *See* ALJ Logan-Thomas's Adj. at 17-19 (C.R. at 211-213). ALJ Logan-Thomas afforded Mother's testimony the same probative value as the Department's witnesses. *See id*. at 19 (C.R. at 213).

By Final Administrative Action Order dated November 3, 2022, the BHA affirmed ALJ Logan-Thomas's adjudication. *See* C.R. at 195. On November 18, 2022, Petitioner requested reconsideration by Secretary Snead, which Secretary Snead granted on December 1, 2022. On January 9, 2023, Secretary Snead issued the Final Order upholding the BHA's decision. *See* C.R. at 232. Petitioner appealed to this Court.[17]

---

[17] This Court's review of Secretary Snead's Final Order is limited to determining whether an error of law was committed, whether necessary findings of fact were supported by substantial evidence, and whether constitutional rights were violated. *See Brenckman v. Dep't of Hum. Servs.*, 222 A.3d 38 (Pa. Cmwlth. 2019).

> The Secretary of the Department (or the Secretary's designee) is the ultimate fact[-]finder . . . and, as such, is free to accept or reject the testimony of any witness, either in whole or in part . . . . In determining whether a finding of fact is supported by substantial evidence, th[is] Court is required to give the party in whose favor the decision was rendered "the benefit of all reasonable and logical inferences that may be drawn from the evidence of record." *S.T. v. Dep*[*'t*] *of Pub*[.] *Welfare, Lackawanna C*[*nty*.] *Off*[.]*, Child*[.]*,*

Initially, "[t]he Free Exercise Clause of the First Amendment, applicable to the [s]tates under the Fourteenth Amendment [to the U.S. Constitution], provides that 'Congress shall make no law . . . prohibiting the free exercise' of religion."[18] *Fulton v. City of Phila., Pa.*, 593 U.S. 522, 532 (2021); *see also St. Elizabeth's Child Care Ctr. v. Dep't of Pub. Welfare*, 989 A.2d 52 (Pa. Cmwlth. 2010). The Free Exercise Clause's "purpose is to secure religious liberty in the individual by prohibiting any invasions thereof by civil authority." *Sch. Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 223 (1963). To that end, it "guarantees that citizens can believe and profess their sincerely[ ]held religious beliefs,"[19] *Kocher v. Bickley*, 722 A.2d 756, 759 n.10 (Pa. Cmwlth. 1999), and "categorically prohibits government from regulating, prohibiting, or rewarding religious beliefs as such." *McDaniel v. Paty*, 435 U.S. 618, 626 (1978) (plurality).

"At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Church of Lukumi Bablu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993). The U.S. Supreme

---

*Youth & Fam*[.] *Serv*[*s.*], 681 A.2d 853, 856 (Pa. Cmwlth. 1996). Further, because determinations regarding credibility and weight of the evidence are for the fact[-]finder, we will not disturb those determinations absent an abuse of discretion.

*Allegheny Cnty. Off. of Child., Youth & Families v. Dep't of Hum. Servs.*, 202 A.3d 155, 163-64 (Pa. Cmwlth. 2019).

[18] U.S. CONST. amend. XIV.

[19] "In the free exercise area, two threshold requirements must be met before particular beliefs may be accorded First Amendment protection. First, the beliefs avowed must be 'sincerely held,' and second, the beliefs must be 'religious in nature, in the claimant's scheme of things.'" *Monroe v. Unemployment Comp. Bd. of Rev.*, 535 A.2d 1222, 1225 (Pa. Cmwlth. 1988) (quoting *Africa v. Commonwealth of Pa.*, 662 F.2d 1025, 1030 (3d Cir. 1981)). The Department did not deny the exception in the instant case on the basis that Petitioner's or his family's beliefs are not sincerely held or are not religious in nature.

Court has "repeatedly held that a [s]tate violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits." *Carson as next friend of O. C. v. Makin*, 596 U.S. 767, 778 (2022). Therefore, "a person may not be compelled to choose between the exercise of a First Amendment right and participation in an otherwise available public program." *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 716 (1981).

> As the [Supreme] Court put it more than 50 years ago, "[i]t is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." *Sherbert* [*v. Verner*], 374 U.S. [398,] 404 . . . [(1963)];[20] *see also McDaniel*, 435 U.S.[] at 633 . . . (Brennan, J., concurring in judgment) (the "proposition - that the law does not interfere with free exercise because it does not directly prohibit religious activity, but merely conditions eligibility . . . on its abandonment - is . . . squarely rejected by precedent").

*Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 463 (2017).

"To determine whether religious rights are unconstitutionally impinged, there are no bright line tests, but instead an analysis is made of the statute [or government action] at issue and a balancing of the interests involved." *Kocher*, 722 A.2d at 759.

> Depending on the nature of the challenged law or government action, a free exercise claim can prompt either strict scrutiny or rational basis review. If a law is "neutral" and "generally applicable," and burdens religious conduct only incidentally, the Free Exercise Clause offers no protection. [*See Emp. Div., Dep't of Hum. Servs. of Or. v. Smith*, 494 U.S. 872 (1990)].[21] . . . On the other hand, if

---

[20] *Sherbert* has been abrogated on other grounds. *See Holt v. Hobbs*, 574 U.S. 352 (2015).

[21] Until the U.S. Supreme Court decided *Smith* in 1990, it (and, consequently, lower courts) consistently interpreted the Free Exercise Clause to require state officials to justify even incidental burdens on religious free exercise solely under strict scrutiny. *See Fulton*; *see also Kentucky v. Yellen*, 54 F.4th 325 (6th Cir. 2022). A divided *Smith* Court created the new test under which

> the law is not neutral . . . or is not generally applicable . . ., strict scrutiny applies and the burden on religious conduct violates the Free Exercise Clause unless it is narrowly tailored to advance a compelling government interest. [*See Lukumi*].

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 165 (3d Cir. 2002); *see also Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 526 (2022) ("Failing either the neutrality or general applicability test is sufficient to trigger strict scrutiny. *See Lukumi*, 508 U.S. at 546 . . . ."); *Fulton*; *Religious Rights Found. of PA v. State Coll. Area Sch. Dist.*, ___ F. Supp. ___, 2023 WL 8359957 (M.D. Pa. No. 23-CV-01144, filed Dec. 1, 2023).[22]

> A government policy will not qualify as neutral if it is "specifically directed at . . . religious practice." *Smith*, 494 U.S. at 878 . . . . A policy can fail this test if it "discriminate[s] on its face," or if a religious exercise is

---

generally applicable, religion-neutral laws that have the effect of burdening a particular religious practice need only survive rational basis review rather than strict scrutiny. Although the *Smith* test has received substantial judicial criticism, it remains binding on the courts because the Supreme Court has declined to overturn it. *See Fulton*.

　　Notably, "[i]n *Smith*, the Supreme Court [] stated that its decision did not dilute the authority of Congress and states to enact laws that protect its citizens' right[s] to freely practice their religious beliefs." *Ridley Park United Methodist Church v. Zoning Hearing Bd. Ridley Park Borough*, 920 A.2d 953, 958 (Pa. Cmwlth. 2007). Congress accepted the Supreme Court's invitation and enacted the Religious Land Use and Institutionalized Persons Act (prohibiting implementation of regulations on land use and on persons confined to institutions in a manner that places a substantial burden on the religious exercise unless the burden furthers a compelling governmental interest and does so by the least restrictive means), 42 U.S.C. § 2000cc-2000cc-5. *See id*. Pennsylvania's General Assembly enacted the RFPA. *See id.*

22　　"Generally, decisions of federal district courts and courts of appeals are not binding on this Court, . . . but they may have persuasive value." *GGNSC Clarion LP v. Kane*, 131 A.3d 1062, 1069 n.15 (Pa. Cmwlth. 2016). "Unreported federal court decisions may also have persuasive value." *Nagle v. TrueBlue, Inc.*, 148 A.3d 946, 959 n.15 (Pa. Cmwlth. 2016).

*Austin v. Lehigh & Northampton Transp. Auth.*, 309 A.3d 252, 259 n.6 (Pa. Cmwlth. 2024).

otherwise its "object." *Lukumi*, 508 U.S. at 533 . . . ; *see also Smith*, 494 U.S. at 878 . . . .

*Kennedy*, 597 U.S. at 526. Here, "[the Department's 40/60 Rule is] facially neutral, and there is no evidence of a discriminatory history or motivation in drafting [it]. Although a facially neutral policy can fail to be neutral in application, th[is C]ourt need not reach th[at] question because the [40/60 Rule] is not generally applicable[.]" *Religious Rights Found. of PA*, 2023 WL 8359957, at *5; *see also Tenafly*.[23]

In 2002, in response to *Smith*, the General Assembly enacted the RFPA to restore the long standing strict scrutiny test - compelling interest and least restrictive means - for free exercise case analyses. *See Ridley Park United Methodist Church v. Zoning Hearing Bd. Ridley Park Borough*, 920 A.2d 953, 959 (Pa. Cmwlth. 2007). Accordingly, Section 4 of the RFPA also provides:

> **(a) General rule.--**Except as provided in subsection (b), an agency shall not substantially burden a person's free exercise of religion,[24] including any burden which results from a rule of general applicability.

---

[23] "A government policy will fail the general applicability requirement if it 'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way,' or if it provides 'a mechanism for individualized exemptions.'" *Kennedy*, 597 U.S. at 526 (quoting *Fulton*, 593 U.S. at 534). "[A] law must satisfy strict scrutiny if it permits individualized, discretionary exemptions because such a regime creates the opportunity for a facially neutral and generally applicable standard to be applied in practice in a way that discriminates against religiously motivated conduct." *Blackhawk v. Pa.*, 381 F.3d 202, 209 (3d Cir. 2004); *see also Fulton*, 593 U.S. at 624 ("Exceptions for one means strict scrutiny for all." (Gorsuch, J., concurring)); *Religious Rights Found.*, 2023 WL 8359957, at *5 ("[T]he Free Exercise Clause is not offended where the government refuses to provide special treatment."). Because strict scrutiny applies "where the [s]tate has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without [a] compelling reason." *Fulton*, 593 U.S. at 534 (quoting *Smith*, 494 U.S. at 884).

[24] Section 3 of the RFPA defines *free exercise of religion* as "[t]he practice or observance of religion under section 3 of [a]rticle I of the Constitution of Pennsylvania." 71 P.S. § 2403. Article I, section 3 of the Pennsylvania Constitution states:

17

**(b) Exceptions.--**An agency may substantially burden a person's free exercise of religion if the agency proves, by a preponderance of the evidence, that the burden is all of the following:

(1) In furtherance of a compelling interest of the agency.

(2) The least restrictive means of furthering the compelling interest.

71 P.S. § 2404. Section 5(a) of the RFPA authorizes: "A person whose free exercise of religion has been burdened or likely will be burdened in violation of [S]ection 4 [of the RFPA] may assert that violation against an agency as a claim or defense in any judicial or administrative proceeding." 71 P.S. § 2405(a). Thus, the RFPA likewise prohibits the state from imposing substantial burdens on the free exercise of religion without a compelling interest and a showing that the least restrictive means have been employed to satisfy that interest.

Petitioner argues that the Department's refusal to grant him an exception to the 40/60 Rule infringes upon his constitutional right to freely exercise his religion by forcing him to choose between complying with his family's religious practices and foregoing some services to which he is entitled. Petitioner adds that, because the Department has made an exception for one individual and also generally for families that wished to refuse unrelated caregivers during the COVID-19 pandemic, the 40/60 Rule cannot withstand strict scrutiny because the Department

---

All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; no man can of right be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent; no human authority can, in any case whatever, control or interfere with the rights of conscience, and no preference shall ever be given by law to any religious establishments or modes of worship.

PA. CONST. art. I, § 3. Because the Pennsylvania Constitution does not afford broader protection than the Free Exercise Clause, this Court may follow federal precedent when considering free exercise claims. *See Meggett v. Pa. Dep't of Corr.*, 892 A.2d 872 (Pa. Cmwlth. 2006).

18

cannot demonstrate that it has a compelling interest in denying Petitioner an exception so that he can claim all of the services he needs without violating his religion.

Petitioner also asserts that the Department's refusal to grant him an exception to the 40/60 Rule violates the RFPA, where he has shown by clear and convincing evidence that placement of an unrelated caregiver in his home would burden his and his family's religious exercise, and the Department cannot show that its denial of an exception is the least burdensome way to serve a compelling interest.

However, before this Court may reach whether the Department had a compelling interest in denying Petitioner an exception,[25] Petitioner "first must

---

[25] The Department clearly has a compelling interest in meeting the needs of eligible individuals receiving long-term care supports and services in their home or community rather than in an institutional setting, particularly by paying Petitioner's family members for up to 60 hours of the care they provide for him. However, the Department's specific motive for implementing the 40/60 Rule is not clear in this record, and the Department does not offer a compelling interest argument for its refusal to grant an exception to the 40/60 Rule in Petitioner's case. ALJ Logan-Thomas identified what could broadly be considered a compelling reason to deny a permanent exception; namely, that Mother's and Sister's lack of rest could negatively affect the quality of service they provide for Petitioner. *See* ALJ Logan-Thomas's Adj. at 19 (C.R. at 213). ALJ Logan-Thomas reasoned:

> [Mother] cares for [Petitioner] from 6:00 [a.m.] to 10:00 [p.m]. She is only paid from 6:00 [a.m.] to 5:00 [p.m.]. She is unpaid from 5:00 [p.m.] to 10:00 [p.m.]. She goes to bed around 11:00 [p.m.] and wakes up for prayer around 5:45 [a.m]. This means that each night [Mother] is getting less than [seven] hours of sleep. Similarly, [Sister] works at her day job from 8:30 [a.m.] to 4:30 [p.m.], after which she goes to her home to sleep. [Sister] arrives at [Mother's] home in time for her [] shift with [Petitioner], which runs from 10:00 [p.m.] to 6:00 [a.m]. This means, that without incorporating time for [Sister] to get herself from her day job to her home and later in the evening from her home to [Mother's] home, [Sister] is sleeping for approximately five (5) hours per day/night. The schedules of both women are quite demanding, and the assistance of another aide would be helpful. Lack of adequate rest can adversely affect the functioning of human beings.

19

establish that the application of [the 40/60 Rule] substantially burdens [his] free exercise of religion." *St. Elizabeth's Child Care Ctr.*, 989 A.2d at 55; *see also Commonwealth v. Stewart*, 690 A.2d 195 (Pa. 1997) (after a plaintiff establishes that government action substantially burdens his free exercise of religion, the government must establish that the burden advances a compelling interest and is the least restrictive means); *S. Hills Cath. Acad. v. Dep't of Hum. Servs.*, 308 A.3d 915 (Pa. Cmwlth. 2024) (whether application of a Department regulation substantially burdens a constitutional right under the religious practice clauses in the First Amendment is a threshold matter).

The U.S. Court of Appeals for the Third Circuit (Third Circuit Court) declared:

> In order to establish a substantial burden, [p]laintiffs must . . . allege **state action** that **is either compulsory or coercive in nature**. *See Lee* [*v. Weisman*], 505 U.S. [577,] 621 . . . [(1992)] (a Free Exercise Clause violation is predicated on coercion); *see also Lyng v.* [*Nw.*] *Indian Cemetery Protective Ass'n*, 485 U.S. 439, 447-[]51 . . . (1988); *Bowen v. Roy*, 476 U.S. 693, 704-[]05 . . . (1986); . . . *Schempp*, 374 U.S. [at] 223 . . . (stating that " . . . it is necessary in a free exercise case to show the coercive effect of the enactment as it operates against him in the practice of his religion[]"); *see also Mozert v. Hawkins*

*Id.* at 18-19 (C.R. at 212-213).

While Petitioner's safety is undoubtedly an interest of the greatest importance, and the Department may have *intended* the 40/60 Rule to encourage families to allow others to provide breaks in 24-hour care for that reason, the Department's 40/60 Rule is not narrowly tailored to serve that interest. Despite that the 40/60 Rule states that HCBS recipients "may *receive* no more than 60 hours per week of authorized [HCBS] . . . from all relatives[,]" C.R. at 86 (emphasis added), and "[t]he 60-hour limit applies only to *who* delivers the services to a participant," FOF 6 (C.R. at 200), in reality, it merely limits the number of hours relatives are *eligible to be paid* for providing such care. *See* FOF 4 (C.R. at 200); *see also Jalil*, slip op. at 24 ("The only limitation imposed by [the 40/60 Rule] relates to the number of hours for which [Petitioner's] family members may be reimbursed for providing [such] services[.]"). Thus, Mother and Sister can and, as Mother testified, they do intend, in the absence of an exception, to provide *all* of Petitioner's care, despite being paid for only 60 hours. *See* C.R. at 516-517, 521, 534.

20

> *C*[*nty.*] *Bd. of Educ.*, 827 F.2d 1058, 1066 (6th Cir.1987) (stating that "[i]t is clear that governmental compulsion either to do or refrain from doing an act forbidden or required by one's religion, or to affirm or disavow a belief forbidden or required by one's religion, is the evil prohibited by the Free Exercise Clause[]").  The concept is a simple one.  "In essence, the state may not compel an individual to act contrary to his religious beliefs."  *Arnold* [*v. Bd. of Educ. of Escambia Cnty.*], 880 F.2d [305,] 314 [(11th Cir. 1989)].[26]

*Anspach ex rel. Anspach v. City of Phila., Dep't of Pub. Health*, 503 F.3d 256, 272 (3d Cir. 2007) (emphasis added).  The Pennsylvania Superior Court agreed.  *See Kaur v. Singh*, 259 A.3d 505 (Pa. Super. 2021).  This Court has quoted federal free exercise law interpreting that "[a] substantial burden is one that 'necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable.'"  *Ridley Park*, 920 A.2d at 961 n.15 (quoting *C.L. for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003)).  "A mere inconvenience is not enough to meet the substantial burden requirement.  *Braunfeld v. Brown*, 366 U.S. 599 . . . (1961)."  *Id*.

In Section 3 of the RFPA, the Pennsylvania General Assembly similarly defines "substantially burden" as

> [a]n **agency action** which does any of the following:
>
> (1) **Significantly constrains or inhibits conduct or expression mandated** by a person's sincerely held religious beliefs.
>
> (2) **Significantly curtails** a person's ability to express adherence to the person's religious faith.

---

[26] *Arnold* was overruled on other grounds by *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993).  *See Eknes-Tucker v. Governor of Alab.*, 80 F.4th 1205 (11th Cir. 2023).

21

(3) **Denies** a person a **reasonable opportunity** to engage in activities which are fundamental to the person's religion.

(4) **Compels conduct or expression which violates** a specific tenet of a person's religious faith.

71 P.S. § 2403 (emphasis added). Section 5(f) of the RFPA specifies that the person making such claim or defense must show the infringement by **clear and convincing evidence**.[27] *See* 71 P.S. § 2405(f); *see also Commonwealth v. Parente*, 956 A.2d 1065 (Pa. Cmwlth. 2008).

Importantly,

[t]here is no substantial burden if the governmental action does not coerce the individuals to violate their religious beliefs or deny them the "rights, benefits, and privileges enjoyed by other citizens" - even if "the challenged [g]overnment action would interfere significantly with private persons' ability to pursue spiritual fulfillment according to their own religious beliefs." *Lyng*, 485 U.S. at 449 . . . . Nor can a party use RF[P]A to "require the [g]overnment to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens."[28] [*Roy*], 476 U.S. at 699 . . . .[29]

---

[27] "The clear and convincing standard requires evidence that is so clear, direct, weighty, and convincing as to enable the [trier of fact] to come to a clear [conclusion], without hesitancy, of the truth of the precise facts [in] issue." *Verizon Pa. LLC v. Pa. Pub. Util. Comm'n*, 303 A.3d 219, 234 (Pa. Cmwlth. 2023) (quoting *Commonwealth v. Maldonado*, 838 A.2d 710, 715 (Pa. 2003) (citation and quotations omitted)).

[28] If the Department created an exception to the 40/60 Rule for Petitioner specifically, or Muslims in general, it would run afoul of the Free Exercise Clause by targeting religious conduct for distinctive treatment.

[29] Just as the [g]overnment may not insist that appellees engage in any set form of religious observance, so appellees may not demand that the [g]overnment join in their chosen religious practices . . . . "[T]he Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can extract from the government." *Sherbert* . . . , 374 U.S. at 412 (Douglas, J., concurring).

*Roy*, 476 U.S. at 699-700.

22

*Real Alternatives, Inc. v. Sec'y Dep't of Health & Hum. Servs.*, 867 F.3d 338, 357 (3d Cir. 2017). "[A]lthough religious freedom has an important place in our scheme of ordered liberty, it also steadfastly maintains that claims of religious convictions do not automatically entitle a person to fix unilaterally the conditions and terms of dealings with the government." *Kocher*, 722 A.2d at 759 (footnote omitted).

Turning to the instant matter, substantial record evidence supports that the Department's implementation of the 40/60 Rule "did not change the number of services available to meet [Petitioner's] assessed needs." FOF 6 (C.R. at 200). "The degree to which [Mother and Sister] are reimbursed for providing [HCBS and Companion] services does not reduce the amount, duration, or scope of services to which [Petitioner] could avail [him]self, if []he so chose." *Jalil v. Dep't of Hum. Servs.* (Pa. Cmwlth. No. 1856 C.D. 2019, filed Feb. 22, 2021), slip op. at 14. Mother's decision, on Petitioner's behalf, "to have [HCBS and Companion] services performed exclusively by h[is] family members does not translate into a refusal by [the Department] to provide them." *Jalil*, slip op. at 14. Further, substantial record evidence supports that Islamic law allows an unrelated, non-Islamic male aide to assist Petitioner outside Mother's presence (i.e., either outside the home or when Mother leaves the home to attend to personal business), before and after which Mother could provide Petitioner's necessary intimate personal care. *See* C.R. at 537-538, 541-542. In addition, or instead, Mother could enroll Petitioner in a day program, like the Center he previously attended, where staff could provide up to 30 hours of care for Petitioner in a group setting without infringing on his religion.[30]

---

[30] Mother's concern for Petitioner's religious standing and safety in the present context is inconsistent with evidence that, in the past, Petitioner successfully availed himself of the Center's program where staff were able to safely provide his care without infringing upon his right to freely exercise his religion. The Center honored Mother's religious restrictions, and Mother did not previously express concern that Petitioner missing the 1:00 p.m. prayer when he was at the Center violated Islamic law or was detrimental to his religious well-being. The sole reason Petitioner

23

Thus, the only thing that changed since the Department implemented the 40/60 Rule is Mother's decision that Petitioner shall not participate in all services available to him because only she and Sister alone can provide safe, religiously based care for Petitioner.

In *Jalil*,[31] where the issue before this Court was also whether the Department's failure to grant an exception to the 40/60 Rule threatened a Consolidated Waiver recipient's safety, health, and religious beliefs, this Court affirmed the BHA's decision denying the exception, reasoning:

> With regard to whether [the Department's] decision denying [the female r]ecipient's request for an exception to the 40/60 Rule violated her [Islamic] religious beliefs, the ALJ reviewed the testimony presented by [the m]other and [the f]ather and determined that their decision to provide all of [the r]ecipient's [Consolidated] Waiver [] services was a matter of personal preference. . . .
>
> To that end, the record supports the ALJ's conclusion that personal preference guided [the r]ecipient's request for an exception to the 40/60 Rule. Although both her parents expressed concern with the quality of care provided by [the r]ecipient's previous nurses and aides, they acknowledged that unrelated female aides cared for [the r]ecipient in the home after school until bedtime. . . . [The f]ather's speculation that a non-Arabic speaking aide could not effectively communicate with [the r]ecipient is belied by his praise of an English-speaking nurse who cared for her over the course of several years.
>
> It is worth noting that the complication presented here implicates [the f]ather's exercise of his religious beliefs, not [the r]ecipient's. [Consolidated] Waiver [] services are

___

stopped going to the Center was the onset of the COVID-19 pandemic, and he has not re-enrolled thereafter because the Center did not reopen Petitioner's program.

[31] The only significant difference between the instant fact pattern and *Jalil* is that the mother and the father in *Jalil* both care for the recipient and her disabled brother full time and, since both parents are almost always present in the home together, there were fewer chances that the mother or the father would be alone with someone of the opposite gender in violation of Islamic law.

provided to [the r]ecipient, not [the f]ather, and both [the f]ather and [the m]other agreed that Islamic law does not prohibit [the female r]ecipient receiving care from an unrelated female aide. The overarching theme to [the m]other's and [the f]ather's testimony was that they provide the best care for [the r]ecipient. The ALJ's conclusion that personal preference, and not religious concerns, drove their decision to provide [the r]ecipient's [Consolidated] Waiver [] services, is amply supported by the record.

*Jalil*, slip op. at 15-16. The record evidence in the instant case similarly supports that Mother's preference, rather than a burden on the free exercise of Petitioner's religion, is the reason for Petitioner's permanent 40/60 Rule exception request.

The Department's implementation of the 40/60 Rule does not exclude Petitioner from receiving benefits of a public program, nor are Mother and Sister precluded from continuing to provide Petitioner's care if that is Petitioner's choice. That Mother and Sister will no longer be paid for providing more than 60 hours of Petitioner's care imposes no legally cognizable burden on Petitioner's religious rights. Even if Mother's and Sister's religious rights were at issue here, the U.S. Supreme Court has held that some financial sacrifice or inconvenience does not necessarily burden religious exercise. *See Braunfeld*; *see also Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253 (3d Cir. 2007).

Because Petitioner has not shown by clear and convincing evidence that the 40/60 Rule "[s]ignificantly constrains or inhibits conduct or expression mandated by [his] sincerely held religious beliefs[,]" "[s]ignificantly curtails [his] ability to express adherence to [his] faith[,]" "[d]en[ies] [him] reasonable opportunity to engage in activities . . . fundamental to [his] religion[,]" nor "[c]ompels conduct or expression which violates a specific tenet of [his] religious faith[,]" 71 P.S. § 2403, he has failed to meet his initial burden of proving that the application of the 40/60

Rule substantially burdens his free exercise of religion under the Free Exercise Clause or the RFPA.

## Conclusion

Based on the foregoing, the Department properly denied Petitioner's request for a permanent exception to the 40/60 Rule. Accordingly, this Court affirms Secretary Snead's Final Order.

_____
ANNE E. COVEY, Judge

26

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Mohamad Alsyrawan, : 
           Petitioner : 
            : 
        v. : 
            : 
Department of Human Services, :   No. 111 C.D. 2023
           Respondent : 

## O R D E R

AND NOW, this 20th day of May, 2024, Acting Secretary of Human Services Meg Snead's January 9, 2023 Final Order is affirmed.


_____
ANNE E. COVEY, Judge